Jean Flagler **MATTHEWS** (formerly Jean Flagler Mook, formerly Jean Flagler Gonzales, formerly Jean Flagler De-Fina), individually, and as Executrix of the Estate of Ricardo C. Gonzales, deceased

v.

The **UNITED STATES.**

No. 105–64.

United States Court of Claims.

April 17, 1970.

William J. Moss, New York City, attorney of record, for plaintiffs. John Karl Bouman and Cadwalader, Wickersham & Taft, New York City, of counsel.

Roger A. Schwarz, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant. Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM.

This case was referred to Trial Commissioner Louis Spector with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on August 22, 1969. Exceptions to the commissioner's opinion, findings and recommended conclusion of law were filed by both parties and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the

court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth.* Therefore, plaintiff is not entitled to recover with respect to Count I of the petition and to that extent the petition is dismissed. Plaintiff is entitled to recover with respect to Count II of the petition and judgment is entered for plaintiff thereon with the amount of recovery to be determined in further proceedings pursuant to Rule 131(c) (2).

Commissioner Spector's opinion, as modified by the court, is as follows:

Plaintiff-taxpayer [1] brings this action for the recovery of federal income taxes plus deficiency interest heretofore paid by her in the amount of $13,955.49 for calendar year 1957, and in the amount of $954,336.55 for calendar year 1958,[2] together with statutory interest thereon and costs.

The case presents two separate issues. In Count I, the court is required to determine the proper tax treatment to be accorded the transfer of appreciated stock by plaintiff to a former husband, Joseph G. DeFina, pursuant to a written separation agreement and a related marital and property rights agreement. The transfers involved were of 1,000 shares of the capital stock of Standard Oil Company of New Jersey (hereinafter "Standard Oil") on December 4, 1957, and of 25,500 shares of the same stock on January 6, 1958. It is the position of the Commissioner of Internal Revenue that by reason of these transfers plaintiff realized a long term capital gain of $48,720.91 in 1957, and of $1,216,883.21 in 1958, in accordance with Sections 1001(a) and (b), and 61(a) (3) of the Internal Revenue Code of 1954 as amended.[3]

Under Count II, plaintiff claims the right to deduct under section 212 of the code, $617,000 of legal fees totaling $650,000 paid by her in 1958. The Commissioner has disallowed $584,000 of the $617,000 sought to be deducted, primarily on the ground that it is a personal expense.

Although the legal issues above summarized are unrelated, the facts underlying them do run parallel to one another at certain points. As a result, maximum understanding is perhaps better served by stating the facts narratively and chronologically rather than seeking to ascribe them separately to each count. This has been done at length in the accompanying findings of fact, and they are summarized here in the same fashion in order to provide background for this opinion.

In 1913, when she was approximately 3 years of age, plaintiff inherited about $1,000,000 worth of Standard Oil from her grandfather Henry Morrison Flagler. The latter was a partner of John D. Rockefeller, Sr., in the original Standard Oil trust and is also remembered as developer of Palm Beach, Florida, and the Florida East Coast Railroad.

During her minority, plaintiff's oil stocks were held by her father and guardian, Henry Harkness Flagler. On July 14, 1931, shortly after she attained her majority, she placed all her securities in a trust which named her father as trustee, and which was revocable only in his discretion. Because of his advancing years, in 1944 her father desired to be relieved of the management of plaintiff's oil stocks. However, since he disapproved of the manner in which

---

* The opinion of SKELTON, Judge, concurring in part, follows the opinion of the trial commissioner which has been adopted by the court.

1. The Estate of Ricardo C. Gonzales is a nominal plaintiff, since plaintiff executed a joint federal income tax return for calendar year 1958, during which time she and the decedent Gonzales were married.

2. The amount sought for 1958 has not been modified to reflect what appears to be a relatively small downward adjustment resulting from a settlement between the parties of Count III of the petition.

3. Hereinafter referred to as "the code." All section numbers mentioned refer to sections of the code.

she handled her financial affairs, he suggested, and she agreed, that he revoke the 1931 trust and place the corpus thereof in a so-called irrevocable trust (hereinafter the "1944 trust") designating Chemical Bank & Trust Company as trustee. The corpus of that trust consisted, in 1944, of $6,325,000 in oil securities, and $2,800,000 in other securities and cash, for a total of $9,125,000. The securities were those inherited from her grandfather, and those acquired on the investment of accrued income during her minority.

The 1944 trust provided, *inter alia*, that plaintiff and her family reposed special confidence in the stocks of oil companies and related concerns, and that the trustee would not incur liability by reason of its retaining, or reinvesting in, such stocks or securities. The same provision added that the trustee need not retain the oil stocks if it, in its absolute discretion, deemed it unwise to do so.

Plaintiff was settlor of the 1944 trust and entitled to receive all the income therefrom. In addition, plaintiff reserved the right to invade the principal from time to time if that income was insufficient (a) to guaranty her not less than $150,000 per annum for 10 years and $165,000 per annum thereafter; and (b) to pay all of her federal, state and local income, real estate and personal property taxes, regardless of the source of income or property being taxed. She also reserved the right to give up to 25 percent of the principal of the trust to her issue at any time after said issue had attained age 21, and she had a general, unrestricted, testamentary power of appointment of the entire remainder.

Henry Harkness Flagler, plaintiff's father, died in 1952. Prior thereto, plaintiff's income was derived solely from the 1944 trust, and from a trust under her mother's will. During the period 1944 to 1952, plaintiff on occasion found herself short of income, with the result that the trustee of the 1944 trust established a "budget" for her, scheduling payment of some of her bills. At times she was unable to stay within her budget and during the early 1950's, a few of her creditors filed suits against her.

Plaintiff and her former husband, Joseph G. DeFina, were married on February 14, 1953, in San Marino, California, this being her second marriage and his third. She had first met Mr. DeFina socially at Palm Beach, Florida, in 1951. During late 1951 or early 1952 he had offered, at the suggestion of a mutual friend, to assist plaintiff in the management of certain of her financial affairs. Mr. DeFina holds a bachelor's degree in business administration from St. John's University, Brooklyn, New York, and is licensed to teach business practices and business law under an examination given by the City of New York. He testified to having "taken three or four years of post-graduate courses in management engineering and industrial engineering systems, personnel management and all affiliated courses pertaining to management in the engineering profession." He further testified as to his work for the City of New York and as to his Army experience. He characterizes himself as "a management engineer," and as an expert in tax law.

Following her father's death in 1952, plaintiff became the income beneficiary of a trust under his will, and of two additional trusts under her mother's will. These trusts produced annual income of over $330,000 in 1953, increasing to over $700,000 in 1967. During 1945, the first full year of the 1944 trust, the total income of that trust was $357,371 of which $307,961 was from oil securities. As hereinafter described, the 1944 trust was subsequently terminated, and during 1956, the last full year of its existence, it produced income of $1,365,759 of which $1,317,420 was derived from oil securities.

Although the 1944 trust ostensibly provided, as earlier outlined, that all of plaintiff's federal, state and local income, real estate and personal property taxes were to be paid by it, regardless of the source of income or property being

taxed, the trustee questioned this following the death of plaintiff's father when larger amounts of income accrued to her from other sources. The trustee advised her that this issue had been discussed with its attorneys, but that the trustee desired to have the trust instrument judicially construed. Plaintiff was understandably displeased with this development because of the historical payment of all taxes from the 1944 trust, and because she thought the construction and accounting proceeding was unnecessary.

Nevertheless, the trustee filed a petition dated October 31, 1955, in the New York Supreme Court, Dutchess County, seeking a construction of this provision of the 1944 trust. By final order dated October 23, 1956, that court concluded that the 1944 trust required the trustee to pay all plaintiff's taxes regardless of the extent to which this would require invasion of the principal. The court also required payment from the trust of $20,000 to a special guardian, $25,000 to the law firm of Cravath, Swaine & Moore, attorneys for the trustee, and $7,500 to the law firm of Cadwalader, Wickersham & Taft (hereinafter "Cadwalader"), attorneys for plaintiff in that construction proceeding.

Between 1944 and 1957, the years of existence of the 1944 trust, the trustee sold trust securities of the value of $6,929,270 and purchased securities totaling $6,186,278, an excess of sales over purchases of $742,992. During this period, the trustee made payments to plaintiff from the principal, in accordance with the terms of the trust, aggregating $1,158,102. Securities purchased by the trustee during this total period consisted solely of United States Government and tax exempt municipal bonds, except for 1,077 shares of Standard Oil purchased at a cost of $80,400. Securities sold by the trustee during this total period included 7,000 shares of Standard Oil (Kentucky) for $208,900 in 1946, and 15,500 shares of Sinclair Oil for $288,000 in 1947. As a general rule, no representative of the trustee consulted with plaintiff regarding these sales and reinvestments. Plaintiff received regular reports from the trustee and communicated no objections to the transactions described.

However, focusing now specifically on the period 1952 through 1956, the trustee's investment committee exhibited concern over the heavy concentration of oil securities in the trust portfolio, and on several occasions expressed the opinion to plaintiff, both orally and in writing, that it would be advisable to sell a substantial portion of the oil securities to secure diversification. On these occasions, plaintiff always declared that she was unalterably opposed to the sale of any of the oil securities. During this period, the trustee did not sell oil securities. Although it never told plaintiff it would not sell oil securities without her approval, it did advise plaintiff it would take her wishes into account in connection with investment decisions.

Another provision of the 1944 trust directed the trustee to consult with any investment counsel or advisor designated by the plaintiff, the advice and recommendations of any such advisor to be merely for the information and consideration of the trustee. In August of 1952, prior to their marriage, plaintiff selected Mr. DeFina as such an investment counsel at an annual compensation of $5,000, payable from the trust estate. In a report dated August 12, 1952, Mr. DeFina recommended in this capacity that reinvestments be made to replace plaintiff's oil securities with tax free bonds.

In letters dated October 2 and 30, 1952, plaintiff was advised by the trustee that it was investigating the advisability of diversification, but in her letter of October 26, 1952, plaintiff stated her opposition to any changes in the trust investments. She was informed in letters of October 31 and November 12, 1952, that the trustee had no present plans to change the trust investments.

Also in 1952, when the corpus of the 1944 trust had appreciated to about $17,000,000, the trustee obtained an invest-

ment survey from an accounting firm which presented alternative plans involving sale of all or portions of the oil securities, and reinvestment of the proceeds in other securities including tax exempt issues. The surveys set forth the after tax income of plaintiff under the alternative plans.

Again in 1956, the trustee expressed the opinion that oil securities would decline in the next few years. The adjusted basis for income tax purposes of the trust assets was approximately $2,500,-000. The trustee had also obtained an investment survey which disclosed that capital gains taxes of $7,128,000 would result if all the securities were sold.

When the trust was terminated in November 1957, as later detailed, it consisted of oil securities of the value of $32,-433,000, and of tax exempt municipal bonds of the value of $1,557,000, a total value of $33,990,000. Its highest value prior to November 1957 had been in excess of $42,000,000, a figure reached on November 30, 1955.

Two months prior to the trial of this case in July 1968, the value of the oil securities owned by plaintiff and held in trusts established by her for her family as later detailed, was again in excess of its value when the securities were received by her in November 1957, following termination of the 1944 trust.

By the spring of 1956, plaintiff believed in good faith, based on information made available to her, that the trustee had decided to proceed with the sale of a substantial portion of the oil securities, notwithstanding her opposition. She retained the Cadwalader firm (which had previously represented her in the earlier described dispute with the trustee over payment of taxes from the trust) to advise her concerning these trust problems. At the time of this consultation, plaintiff had one son, George Gregory Matthews, then a minor aged 19; an adopted son, William Morrison Matthews, then a minor aged 7; and a ward, George Frederick Robert Hanke, then a minor aged 18, whom she later adopted. Her aforementioned son,

George Gregory Matthews, was a contingent remainderman of the 1944 trust subject to her general power of appointment, and the only other person beneficially interested in the trust.

The legal services performed by Cadwalader in connection with the 1944 trust, between May 1956 and February 1958, are set forth in more detail in the accompanying findings of fact. Briefly summarized, they consisted of analysis of the trust; delay of an impending sale of Standard Oil securities; advice that revocation of the 1944 trust represented the best course of action to accomplish plaintiff's objectives; and development of a plan to emancipate plaintiff's son, George Gregory Matthews, under Florida law, following which plaintiff and her son, being all of the persons beneficially interested in the trust, would give their consent to its revocation.

Following approval of this plan, Cadwalader secured the emancipation of George Gregory Matthews by Florida decree; procured consents to revocation of the trust as permitted by New York law; upon refusal of the trustee to accept the consents as effective, commenced a contested proceeding in New York Supreme Court, Westchester County, seeking a determination that the 1944 trust had been terminated; and represented plaintiff when the trustee declared its intention to appeal from a determination by that court declaring the trust revoked, and directing the trustee to deliver the trust assets to plaintiff.

Negotiations were then commenced between Cadwalader and the trustee's counsel, Cravath, Swaine & Moore, which led to an agreement that the trustee would not proceed with its appeal if plaintiff would establish certain irrevocable family trusts of an aggregate value of not less than $8,000,000 out of specified securities in the 1944 trust. Cadwalader then prepared and attended to the execution and establishment of a trust for the benefit of George Gregory Matthews consisting of oil stocks of the value of $2,673,644.63; of a trust for the benefit of adopted son William Morrison Mat-

thews consisting of oil stock of the value of $2,673,644.63; of a trust for the benefit of ward George Frederick Robert Hanke consisting of oil stocks of the value of $766,336.25; of a trust for the benefit of an employee consisting of oil and other securities of the value of $111,602.50; and of a trust for the benefit of one Prudence E. Ramsey consisting of oil stocks of the value of $108,040.-50.[4]

Cadwalader also represented plaintiff in a proceeding commenced by the trustee of the 1944 trust in New York Supreme Court, Dutchess County, for the settlement of its account, and for an order directing distribution of the trust assets. The Cadwalader firm also represented plaintiff in securing for her two loans totaling $200,000 when she found herself in need of additional funds to cover unusual expenses during the foregoing proceedings.

With the establishment of the five new trusts above described, Cadwalader advised plaintiff that she would incur a substantial gift tax when the trusts were funded, on top of her normally heavy taxes. The firm negotiated collateralized demand loans totaling $2,500,-000 so that she would not be required to liquidate her oil portfolio. This involved review of her investments with investment advisors, together with counseling and advice.

Turning now to the relationship with Mr. DeFina, the record discloses that at the time of their marriage in 1953, he was personally interested in real estate development in Fort Pierce, Florida. Beginning in late 1953 or early 1954, plaintiff began to assist Mr. DeFina by supplying capital for real estate ventures of his Maravilla Development Corporation (hereinafter "Maravilla"). Mr. DeFina had organized Maravilla prior to their marriage and was the sole stockholder. It was his only business. Mara-

villa acquired interests in real properties and built homes thereon for sale. Prior to her disagreements with Mr. DeFina, resulting in the initiation of a divorce proceeding by plaintiff in the fall of 1957, plaintiff had advanced the sum of $307,437.61 to Maravilla or to Mr. DeFina personally for this venture.

In addition to the foregoing, there are other indications that the marriage domicile was in the State of Florida. Plaintiff's home in Palm Beach, called "Vita Serena," was on 3 acres of oceanfront property. At the time of their marriage, plaintiff and Mr. DeFina represented that they were residents of Florida and they believed that representation to be true. Both were registered to vote in Florida, and did vote in Florida during their marriage. They filed Florida intangible property tax returns as residents for the years of their marriage, 1953 through 1957. Mr. DeFina filed his federal income tax returns in Jacksonville, Florida, during their marriage.

Plaintiff was a member of the Church of Bethesda-by-the-Sea, Palm Beach, Florida. Mr. DeFina joined that church as a communicant member on March 6, 1955. William Morrison Matthews, who was about 4 years old at the time of the marriage, attended Palm Beach Day School for each of the school years beginning October 1954 through May 1958. During his marriage to plaintiff, Mr. DeFina and plaintiff frequently visited his three children by his second wife, who lived with their mother in Fort Pierce, Florida.

In their separation agreement dated August 1957, plaintiff and Mr. DeFina represented that they had established their matrimonial domicile in Florida following their marriage, and had at all times maintained their residence and domicile in Florida. The uncontested divorce decree of the Florida Circuit Court in 1957 found that plaintiff was a

4. The aggregate value of the securities placed in trust for her sons and ward as described, was $6,113,625.51. These were the same securities of an aggregate value of $8,500,000 which plaintiff had a few

months earlier agreed to transfer to these trusts in exchange for an agreement by the trustee of the 1944 trust not to appeal the order revoking that trust.

bona fide resident of Florida and that her son, George Gregory Matthews, was a resident of Palm Beach, Florida.

In April 1957, in support of plaintiff's action to revoke the 1944 trust as earlier described, Mr. DeFina testified under oath that his home, domestic headquarters and domicile were in Palm Beach, Florida, and that he had settled in Florida in 1949 and had engaged in business and resided continuously in Florida since that time. The August 1957 order of the New York Supreme Court in the trust revocation proceeding found that plaintiff and her son, George Gregory Matthews, then resided and were domiciled in Florida.

In opposition to this, defendant's principal reliance is on plaintiff's Rye, New York, estate called "Brookside" which consisted of 93 acres, and a home containing 18 to 20 rooms. Plaintiff employed 15 or 16 full-time domestic servants and gardeners at Brookside, and in her 1956 federal income tax return reported indirect operating expenses for the estate of $146,301.97. Plaintiff also owned a camp property at Lake Placid, New York.

In August 1957, when plaintiff instructed Mr. Robert E. Lee of the Cadwalader firm to confer with Mr. DeFina with regard to a separation and divorce, neither party had previously raised that issue. Plaintiff was a hospital patient when the first conference took place. Mr. DeFina testified that he first felt a strain in his marriage after the court in the trust revocation action indicated a favorable decision for plaintiff and, when discussing the transfer of the trust assets, Mr. Lee suggested that part of the shares be transferred into plaintiff's name and part into Mr. DeFina's name. Plaintiff, on the other hand, testified that her marriage had become intolerable because of Mr. DeFina's violent temper, and his harshness with her children as well as with his own. In addition, plaintiff testified that Mr. DeFina had lied to her throughout their marriage.

The meetings between Mr. DeFina and Mr. Lee were not adversary, in the usual sense of that word. Mr. DeFina knew Mr. Lee socially, and as attorney for plaintiff. He considered Mr. Lee a very fine gentleman and had great admiration for him. Mr. DeFina did not obtain the services of an attorney of his own to represent him in the matter.

Under Florida law, a wife in these circumstances has rights against her husband, but a husband has no claim against a wife or ex-wife for maintenance or support. Prior to meeting with Mr. DeFina, Mr. Lee advised plaintiff of the law in this respect, of the absence of any rights by Mr. DeFina under Florida law, and of the absence of any obligation whatsover on the part of plaintiff to give Mr. DeFina anything. After due consideration, she decided to make it possible for him to continue his commitments to Maravilla which she had encouraged him to enter into. She understood that Maravilla would require additional funds in excess of $1,000,000 to complete its development and she authorized Mr. Lee to negotiate a suitable settlement for her.

At the first meeting, Mr. Lee informed Mr. DeFina of plaintiff's desire for a divorce and of his authority to make the necessary arrangements. Mr. DeFina prepared an outline of matters to be discussed which he brought with him to the second meeting. This meeting featured a general discussion of plaintiff's prior investment in Maravilla, and of other pieces of property purchased with plaintiff's funds but in Mr. DeFina's name. They also discussed Mr. DeFina's signing a joint gift tax return with plaintiff for 1957.

Mr. Lee advised Mr. DeFina that he was authorized to offer a settlement totaling $1,700,000, less what monies plaintiff had theretofore invested in Maravilla. Mr. DeFina accepted the offer. The figure of $1,700,000 did not have any special significance to either party and their was no bargaining or discussion over this amount. Plaintiff had instructed Mr. Lee to settle in terms of a dollar amount subject to her having no difficulty in obtaining a separation. Mr.

DeFina testified at the trial of this case that he was "in no mood to quibble or argue or to contest" plaintiff's offer. He stated that he "felt it was a fair settlement and let it go at that, there being no contest, I didn't want any mud slinging or publicity or notoriety or anything else, just 'Let's close it like that.' If that is what she wanted and she was willing to pay for it, I was satisfied."

Also as part of the agreement reached at this meeting, Mr. DeFina agreed to join with plaintiff in a gift tax return for 1957, and also in any other returns which might be required to be signed by husband and wife. He also assured Mr. Lee that he would not remarry during the remainder of 1957, that being the period covered by the gift tax return.

Mr. Lee and Mr. DeFina computed the advances which had been made by plaintiff as previously described, and subtracted this sum from $1,700,000, leaving a net cash balance of $1,312,562.39. It was Mr. DeFina's testimony that Mr. Lee then suggested that he accept Standard Oil stock in lieu of cash, if he was going to invest it anyway, and that after being assured, in response to his question that there would be no "tax problems," he agreed. Based upon the market value as of that day, the parties agreed upon 21,200 as the number of shares to be transferred. Because the transfer could not be consummated until plaintiff obtained possession of the stock from the 1944 trust, it was further agreed that the number of shares would be adjusted by supplemental agreement to compensate for interim fluctuation in market value.

At these meetings, and in the "separation agreement" and "marital and property rights agreement" hereinafter summarized, words such as "gift" were not employed. The separation agreement, dated August 20, 1957, provided:

(a) That the parties agreed to live separate and apart for the rest of their lives, and that neither would bring any action for the restitution of conjugal rights.

(b) That the parties had contemporaneously executed a separate "marital and property rights agreement" settling their property rights and financial matters to their mutual satisfaction.

(c) That plaintiff waived her rights of support and maintenance, and that each party renounced any and all rights of curtesy, dower or homestead in any property which the other owned or might thereafter acquire.

(d) That each party renounced, should he or she survive the other, any and all rights to share in the estate or property of the other by descent or inheritance, by virtue of the present or future laws of Florida or New York, or of any other state or country, including any right of election under Section 18 of the New York Decedents Estate Law.

(e) That Mr. DeFina agreed, without right of revocation, to signify his consent for federal gift tax purposes, to have all gifts made by plaintiff while the parties were legally married, considered as having been made one-half by him and one-half by plaintiff, on the express understanding that plaintiff would pay all gift taxes required to be paid.

(f) That in the event divorce proceedings were instituted in any jurisdiction, the parties agreed to be bound by the terms of this separation agreement, notwithstanding the decree entered in any such divorce proceeding.

In the concomitant marital and property rights agreement, Mr. DeFina agreed to transfer to plaintiff any title he held solely or jointly in the following property which had been purchased with plaintiff's funds:

| Item | Cost & Agreed Value |
|------|------|
| (a) A boat, "The Flagler | $20,500.00 |
| (b) Speedboat | 3,948.75 |
| (c) Two automobiles | 8,266.12 |
| (d) Real estate, "Fairhaven" | 80,000.00 |
| (e) 30-foot strip at Lake Placid | 3,000.00 |

Plaintiff in this agreement forgave the indebtedness of $307,437.61 due from Maravilla, or Mr. DeFina; agreed to pay him $80,000 in cash that he required immediately to complete the purchase of a property in Vero Beach, Florida, on which $95,000 had already been paid; and agreed to transfer 21,200 shares of Standard Oil to him if, as, and when the then pending trust revocation proceeding was successful. The supplemental marital and property rights agreement subsequently executed as of November 16, 1957, adjusted the number of shares upward by 5,300, making the total to be transferred to Mr. DeFina 26,500, to compensate for fluctuations in market value, as previously agreed. It also confirmed Mr. DeFina's prior undertaking not to remarry in the balance of 1957, thus assuring that he could execute the aforementioned consent of spouse on plaintiff's 1957 federal gift tax return.

Plaintiff was granted an uncontested divorce by the Circuit Court in Florida on November 22, 1957. The decree approved the aforementioned separation agreement. The grounds alleged by plaintiff in the divorce proceeding were extreme cruelty based upon Mr. DeFina's failure in his duty to keep himself gainfully employed, and to contribute to the support and maintenance of plaintiff; and acts by Mr. DeFina that affected the mental and physical health of plaintiff. Mr. DeFina testified in this case, that he had never read the petition filed in the divorce action.

In pursuance of the separation and the marital and property rights agreements, plaintiff transferred 1,000 shares of Standard Oil to Mr. DeFina on December 4, 1957, and 25,500 shares to him on January 6, 1958. The first group of shares had an aggregate adjusted basis in plaintiff's hands of $2,091.59, and an aggregate fair market value of $50,812.50. The second group had an aggregate adjusted basis in plaintiff's hands of $53,335.54, and an aggregate fair market value of $1,270,218.75. In summary, plaintiff waived her rights of support and maintenance against Mr.

DeFina and, in addition, transferred to him securities, money, and other property rights having an aggregate fair market value at the time of transfer of $1,708,468.86. Of this amount, $1,321,031.25 was represented by the transfer of the Standard Oil stock.

Mr. DeFina gave his consent in plaintiff's 1957 gift tax return as agreed, thereby enabling her to realize a saving of $541,503.64 in federal gift taxes, and he did not remarry during the remainder of 1957, thereby preserving the effectiveness of this consent.

Section 18 of the New York Decedents Estate Law, mentioned in the earlier summary of the separation agreement, permits a surviving spouse to elect to take his or her intestate share of a decedent's estate, against the terms of a will purporting to disinherit the surviving spouse. In the case of a decedent not domiciled in New York State at the time of death, it is acknowledged to apply only to property of the decedent located in New York. Plaintiff had executed a will on June 1, 1957, naming Mr. DeFina as one of the beneficiaries. On September 9, 1957, she executed a second codicil which undertook to carry out the provisions of the above described marital and property rights agreement in the event it should not otherwise be carried out, and in all other respects eliminated Mr. DeFina from participating in plaintiff's estate.

Mr. DeFina was the sole witness called by defendant at the trial of this case, and he testified in defendant's behalf. It appeared that he had filed a suit now pending in the United States District Court, Southern District of Florida, for recovery of $32,393.47 in income tax and interest paid by him for taxable year 1958, arising out of the disposition by him of all or part of the 1,000 shares of Standard Oil transferred to him by plaintiff on December 4, 1957, as earlier described. It also appeared that there is pending in the Tax Court of the United States, a suit filed by Mr. DeFina contesting a deficiency of $64,506.51 in his income taxes for 1959, arising out of the

disposition by him of certain of the above-mentioned 25,500 shares of Standard Oil transferred to him by plaintiff on January 6, 1958. Moreover, it appeared that Mr. DeFina had been given to understand that he owed additional taxes in substantially greater amounts in subsequent years, should plaintiff prevail on Count I in this action. He had been further informed by Government attorneys that if plaintiff lost on Count I in this action (arising out of the transfer of the above described Standard Oil stock from plaintiff to him), the Government would abandon these alternative tax claims against him.

This testimony was developed on cross-examination after Mr. DeFina had originally denied in his testimony that he had ever discussed these possibilities with Government attorneys. His recollection was refreshed when plaintiff's counsel read and introduced a letter dated January 14, 1968,[5] from Mr. De-Fina to plaintiff in which such statements were recounted.

On the issue presented by Count I, namely, whether plaintiff realized a long term capital gain on her transfer of 26,-500 shares of Standard Oil stock to Mr. DeFina, defendant filed a motion for partial summary judgment dated November 8, 1966, which was denied by the court May 26, 1967. In a response to that motion filed January 11, 1967, plaintiff alleged that her transfer of the 26,500 shares of Standard Oil to Mr. De-Fina was not in exchange for the release of marital rights of any economic value, but rather that it was made voluntarily and gratuitously in the light of plaintiff's then financial situation.

On July 3, 1968, the Commissioner of Internal Revenue issued a "90-day" letter to plaintiff in which he proposed a gift tax deficiency of $599,158.89 for 1958 on the ground that the transfer of 25,500 shares of Standard Oil from plaintiff to Mr. DeFina represented a gift. In her petition in the Tax Court filed October 1, 1968, plaintiff alleged that this transfer was in partial performance of the aforementioned separation and the marital and property rights agreements dated August 20, 1957, as supplemented November 16, 1957.

The legal fees for the period October 11, 1954, to February 1, 1958, involved in Count II of the petition, were first discussed during February 1958 when the aforementioned Mr. Lee of the Cadwalader firm flew to Florida for that purpose.[6] He advised plaintiff that in view of the complexity and unique character of the services rendered (primarily in connection with the revocation of the 1944 trust), a fee for all services of between $400,000 and $1,000,000 would be appropriate. However, he requested that plaintiff consider the matter, and discuss it further with him at her convenience. Mr. Lee further advised her that a portion of the fee decided upon by her would be deductible on her income tax returns, but he did not specify any percentages or otherwise state or indicate what part of the fee would be deductible.

After carefully considering the matter, and taking into consideration the limits suggested by Mr. Lee, plaintiff concluded without further discussion of any kind that a total fee of $650,000 would be appropriate, and she paid Cadwalader that amount by check dated March 5, 1958. She would have paid this amount even if no portion thereof had been deductible. After payment, Cadwalader prepared a memorandum of services in final form stating that $617,-000 of the total $650,000 fee was regarded by the attorneys as deductible.[7] At Cadwalader, fees are fixed solely by the partner in charge of the particular mat-

---

5. Plaintiff's trial exhibit B. The trial began on July 8, 1968.

6. The fee for the 1944 trust construction proceeding, earlier outlined, had been paid from the trust and was not involved in this discussion.

7. The only legal fees paid by or on behalf of plaintiff to any Florida attorneys were $100 for the emancipation of George Gregory Matthews, and $850 for plaintiff's divorce.

ter. It is also his responsibility to determine which portion of the fee shall be represented to the client as deductible, and which shall not be so represented.

It appears that a total of 3,966.5 hours of service were expended by partners, associate attorneys and accountants of Cadwalader in rendering these services. However, Mr. Zurcher, the Cadwalader partner who testified with respect to these fees, explained that the amount of time, as such, was not given any weight by him in developing an appropriate allocation. He considered that the importance of the matters involved, the need to accomplish a result in an extremely short period of time, and the success of the firm's efforts, were the factors which deserved principal weight.

Diaries or "time sheets" were maintained in 10-minute units, as a bookkeeping device to enable the firm to compare its operating expenses with its charges for a given service. After qualification as a partner familiar with the firm's billing practice, and of the services rendered to plaintiff, Mr. Zurcher testified that the following (briefly summarized) is an appropriate allocation of the $617,000 portion of the fee claimed by plaintiff to be deductible:

A. Ten percent ($61,700) for tax, investment and management services not related to the 1944 trust; namely, audit of plaintiff's 1955 and 1956 federal income tax returns, assembly of data for her 1957 return, tax advice involved in drafting and negotiating the settlement and divorce matters, and service relating to application of the Florida intangible personal property tax.

B. Twenty percent ($123,400) for tax services related to the 1944 trust; namely, gift tax services in working out the above described arrangement

with Mr. DeFina, in establishing the irrevocable trusts for the benefit of her children and in valuing the securities to obtain certain permissible gift tax discounts, analysis of capital gains which would result if the trustee of the 1944 trust should elect to sell the oil securities, possible income tax aspects of the transfer by plaintiff to Mr. DeFina of appreciated securities, and the deductibility of the legal fees.

C. Fifty percent ($308,500) for the nontax planning aspects relating to the 1944 trust; namely, plans to prevent disposition of the oil securities, to procure the emancipation of George Matthews in Florida, to institute an adversary proceeding to secure revocation of the trust, to secure withdrawal of the trustee's subsequent appeal, and to secure a final accounting.

D. Twenty percent ($123,400) for implementation of the foregoing plans.

The remaining $33,000 of the total $650,000 fee paid by plaintiff was allocated by Cadwalader to nondeductible services related to her domestic problems, protection of her property in connection with the separation and divorce, preparation of the marital and property rights agreements, negotiation of the settlement, and of return of the various items of personalty above described. By coincidence, $33,000 is also the figure which the Commissioner, without further explanation, is willing to acknowledge as deductible.[8]

Moreover, defendant acknowledges that the total fee of $650,000 was reasonable for all of the services described, and that $33,000 was a reasonable fee for the services described as nondeductible.

*Count I—Tax Treatment To Be Accorded Transfer of Appreciated Stock to Former Husband DeFina*

The parties are in general agreement that this issue pivots on United States v.

8. Resulting in a disallowance of $584,000 of the total fee. ($650,000 minus $33,000 conceded to be nondeductible by

plaintiff, minus $33,000 acknowledged to be deductible by defendant.)

Davis,[9] but thereafter they part company. Defendant urges that *Davis* governs this case whereas plaintiff would have this court hold that the rule in *Davis* is not nearly broad enough to cover the substantially different facts presented here.

As a result of that confrontation, the facts in *Davis* become relevant for purposes of comparison. In that case, a husband, in partial implementation of a voluntary property settlement and separation agreement prior to divorce, had transferred appreciated Du Pont stock to his former wife. Both were residents of Delaware and under the laws of that state a wife has certain statutory marital rights including a right of intestate succession, a right upon divorce to a "reasonable" share of the husband's property, and in the case of realty, to dower. The wife accepted this transfer and other payments "in full settlement and satisfaction of any and all claims and rights against the husband whatsoever (including but not by way of limitation, dower and all rights under the laws of testacy and intestacy) * * *."

This Court, 152 Ct.Cl. 805, 287 F.2d 168, held on those facts "that the measure of the value of the wife's right to maintenance and support was dependent upon so many uncertain factors that neither the taxpayer nor a revenue officer could do more than guess at it." It concluded that if "the 'property' received by Davis had no fair market value, or if none has been shown, it may be economic gain but it is not taxable gain by reason of the express provision of section 1001(b)."

In reversing, the Supreme Court recognized that Congress clearly "intended that the economic growth of this stock be taxed," but it queried: "Should the economic gain be presently assessed against taxpayer, or should this assessment await a subsequent transfer of the property by the wife?" Finding that this transfer was a taxable event, and not a nontaxable division of property, it referred to the code definition of a taxable gain from a sale or disposition of property as the "excess of the amount realized therefrom over the adjusted basis" and the further definition that the "amount realized" in this context is "the sum of any money received plus the fair market value of the property (other than money) received."

The key words of the Court's opinion are thereafter contained in the paragraph partially quoted as follows:

It *must be assumed,* we think, that the parties acted *at arm's length* and that *they judged* the marital rights to be equal in value to the property for which they were exchanged. *There was no evidence to the contrary here.* Absent a readily ascertainable value it is accepted practice where property is exchanged to hold, as did the Court of Claims in Philadelphia Park Amusement Co. v. United States, 126 F.Supp. 184, 189, 130 Ct.Cl. 166, 172 (1954), that the values "of the two properties exchanged in an arms-length transaction *are either equal in fact, or are presumed to be equal."* * * * To be sure there is much to be said of the argument that such an assumption is weakened by the emotion, tension and practical necessities involved in divorce negotiations and the property settlements arising therefrom. However, once it is recognized that the transfer was a taxable event, it is more consistent with the general purpose and scheme of the taxing statutes to make a rough approximation of the gain realized thereby than to ignore altogether its tax consequences. * * * [Emphasis supplied.] [United States v. Davis, *supra,* 370 U.S. at 72–73, 82 S.Ct. at 1194]

On the basis of the facts present in her case, and the holding in *Davis*, plaintiff argues that the Supreme Court's opinion stands for the proposition that a transfer of appreciated property inci-

9. 379 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335, rehearing denied, 371 U.S. 854, 83 S.Ct. 14, 9 L. Ed.2d 92 (1962).

dent to a divorce settlement constitutes a taxable event, involving an exchange of property of equal value if, but only if, the settlement was reached at arm's length, the parties intended the exchange to be equal, and the transferor of appreciated property was in fact receiving the release of substantial rights of reasonably equivalent value, even if they could not be accurately valued. She points out that the *Davis* case does not create a *conclusive* presumption that the value of released marital rights, no matter how insignificant, remote or speculative, is equal to the value of appreciated property, no matter how great its value; and she offers the earlier denial by this court of defendant's motion for summary judgment on this point as an indication that these matters are open to proof.

Relating this to the facts of her case, she observes that her marital agreements were not negotiated at arm's length, that she had been advised she was under no legal obligation to Mr. DeFina under the laws of Florida, the state of their domicile, and that unlike *Davis*, she could have divorced her husband without settling any property on him whatsoever. She offers the foregoing, plus her personal desire to provide Mr. DeFina with the means of continuing his Maravilla real estate venture, plus the fact that he engaged no lawyer of his own and accepted her proposal without counteroffers or haggling of any kind, all as demonstrating the basically voluntary nature of her undertaking.

Plaintiff further reminds us of the basic contrast between the bargaining position of a husband and of a wife in these circumstances, noting that courts normally use one-third to one-half of the husband's property as a starting point in determining the amount that should be paid for a gross sum support and dower settlement to a wife; [10] that a discharge in bankruptcy does not relieve a husband from his obligation to pay alimony; [11] that an alimony decree is enforceable against property otherwise exempt from execution; and that these are rights not shared by a husband. In the usual case, such as *Davis*, these substantial rights are being released by the wife and the presumption in *Davis* of an exchange of rights and property of equal value is warranted. Here, in contrast, it is the wife who is releasing a substantial package of marital rights,[12] in addition to transferring to her husband substantial other property aggregating over $1,700,000 in value.

There is, plaintiff observes, a paucity of reciprocal transfers or releases from Mr. DeFina to her. He possessed no marital rights of any value under Florida law,[13] and his right to an intestate share should he survive her during the marriage, was wiped out by her execution of a codicil to her will coincidental with the marital settlement agreements above described. Plaintiff is willing to acknowledge that there is some authority to support the right of election of a surviving spouse to elect against the will of a deceased spouse only with respect to real property located in New York State, though neither spouse was a New York domiciliary.[14]

Following the guidelines above quoted from the *Davis* opinion, to the effect that "it is more consistent with the general

---

10. Citing 2 Nelson, Divorce and Annulment, § 14.37 (2d ed. 1961); Madden, Persons and Domestic Relations, §§ 97–98 (1931).

11. Citing Wetmore v. Markoe, 196 U.S. 68, 25 S.Ct. 172, 49 L.Ed. 390 (1904).

12. Under Florida law, this consists of dower in Mr. DeFina's real and personal property (one-third on death), a right to an intestate share should he die intestate, and a right to separate maintenance and alimony. 21 Fla.Stat.Ann. §§ 731.23 and 731.34.

13. Davies v. Davies, 113 So.2d 250 (Fla. Dist.Ct.App., 3d Dist.) (1959); Gentry-Futch Co. v. Gentry, 90 Fla. 595, 106 So. 473 (1925).

14. In re Tamburri's Will, 198 Misc. 809, 100 N.Y.S.2d 647 (1950); Matter of Slade, 154 Misc. 275, 276 N.Y.Supp. 956 (1935).

purpose and scheme of the taxing statutes to make a rough approximation of the gain realized thereby than to ignore altogether its tax consequences," and the code definition that the "amount realized" from a taxable gain is "the sum of any money received plus the fair market value of the property (other than money) received," plaintiff offers the following formula to ascertain her maximum tax due.

Because plaintiff had children, Mr. DeFina's intestate share was limited to one-third of the New York real property. The parties have stipulated that its fair market value during the period in question was $951,000, without deducting the amount of the mortgages thereon. Assuming he survived her, and assuming plaintiff did not sell or dispose of the real property prior to her death, and assuming they were not divorced at the time of her death, Mr. DeFina's share of one-third would be a maximum of $317,000. Thereafter, applying actuarial factors to determine the present worth of that sum at the death of the younger of two persons age 47 and 49, she arrives at a maximum value for Mr. DeFina's right, of $80,758.92. And this is based on all the assumptions mentioned, including the assumption that they would still be married at the time of her predecease,[15] in spite of their impending divorce, which was in fact concluded shortly thereafter.

Plaintiff then calculates that the Standard Oil stock transferred to Mr. DeFina ($1,321,031.25) represented 77 percent of the total package ($1,708,468.-86) he received.[16] Thus, 77 percent of the right to the $80,758.92 released by Mr. DeFina results in a total of $62,-184.37 in "property received" by plaintiff. Plaintiff is willing to concede a gain in the amount by which said $62,-184.37 exceeded her adjusted basis of $55,426.13 for the stock transferred, namely a gain of $6,758.24.

Similarly, plaintiff disparages the value of the boats, automobiles and real property in which Mr. DeFina surrendered his nominal interest, because neither he nor Maravilla had any beneficial interest in these items. As for the agreement by Mr. DeFina to join in plaintiff's 1957 gift tax return, and to refrain from remarrying during the remainder of that year, plaintiff asserts that the resultant gift tax saving to her of $541,563.64 did not constitute "property received" within the meaning of the code, nor economic detriment to Mr. DeFina. Plaintiff paid all the gift taxes due. Moreover, she cites Estate and Gift Tax Reg. § 25.2511–1(d) to the effect that payment by one spouse of the income tax due on a joint return, is not a transfer subject to gift tax, nor is payment of a gift tax in the case of husband and wife who have consented to have the gifts made considered as made half by each of them. Plaintiff reasons from this that a transaction which does not constitute a "transfer" or "property" for gift tax purposes, similarly should not be deemed a "transfer" or "property" for income tax purposes. Thus Mr. DeFina's splitting of plaintiff's gift does not constitute "property received" by plaintiff.

In summary, plaintiff acknowledges that this transaction was a taxable event, as held in *Davis;* but that *Davis* created merely a rebuttable presumption that the marital rights surrendered by the transferee were equal in value to the property for which they were exchanged; and that in this case, using the words of *Davis,* there is in fact "evidence to the contrary." The consideration given by Mr. DeFina, in contrast to the rights surrendered by the former Mrs. Davis, are subject to valuation, and the rule in *Davis* does not therefore bar their valuation by approximation.

As might be expected, defendant places a considerably higher valuation

15. See In re Ga Nun's Estate, 200 Misc. 789, 104 N.Y.S.2d 344 (1951); In re Adams Estate, 182 Misc. 937, 45 N.Y.S.2d 494 (1943).

16. Or even less than 77 percent, if we add to the total package, the value of the marital rights which plaintiff was surrendering to Mr. DeFina.

on the rights surrendered by Mr. De-Fina. The Government points out that the boats, automobiles and real property, as to which Mr. DeFina surrendered his or Maravilla's nominal title, had a conceded value of $115,750. It emphasizes the benefits to plaintiff resulting from Mr. DeFina's joinder in her gift tax return, making the further point that the anticipated saving in gift tax was about $250,000 more than the actual saving of $541,563 because the gifts were diminished by a depreciation in Standard Oil stock.

Despite the existence of a will disinheriting him, defendant places some value on Mr. DeFina's right of intestate succession under Florida law, arguing that "this assumes that at her death taxpayer would necessarily have a will which would be admitted to probate without contest and found to be valid by the court."

As to Mr. DeFina's right to elect to take his intestate share of realty located in New York, defendant objects to reducing this one-third by applying actuarial values, and argues that "these tables are completely irrelevant * * * since the real property in issue was residential rather than an investment by Mr. DeFina or by taxpayer and the value realized by taxpayer for purposes of this case was not dependent upon the termination of the life of either taxpayer or Mr. DeFina."[17] Moreover, defendant insists that this right under New York law applied to all the plaintiff's property, wheresoever located, since "Mr. DeFina *could have* claimed his rights in taxpayer's property as a New York resident simply by showing that he had an actual intent to make the

State of New York his legal domicile." [Emphasis supplied.]

Finally, defendant argues that plaintiff saved legal fees in Mr. DeFina's "consent to the uncontested divorce."[18]

In the last analysis, defendant places principal reliance on the broad application of the *Davis* rule to the facts in this case. Here too, it is argued, there is uncertainty as to the value of the "property received" by taxpayer. Moreover, the settlement here was expressed in dollars, and the number of shares of stock was adjusted to preserve that dollar amount, so that "for all practical purposes, taxpayer made a sale of the shares."

Defendant's strongest argument is its rebuttal of plaintiff's position that the bulk of the transfer of Standard Oil stock to Mr. DeFina constituted a gift, because of the huge disparity between the value of the stock transferred and the value of the rights relinquished by Mr. DeFina. Citing Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), defendant notes that "the quality of the bargain is irrelevant if in fact there was not the donative intent to make a gift." This highlights the importance of footnote 6 to the *Davis* opinion, which reads as follows:

Any suggestion that the transaction in question was a gift is completely unrealistic. Property transferred pursuant to a negotiated settlement in return for the release of admittedly valuable rights is not a gift in any sense of the term. To intimate that there was a gift to the extent the value of the property exceeded that of the rights released not only invokes the

17. This argument is indeed puzzling. A reading of § 18 of the New York Decedents Estate Law, 13 McKinney's Consolidated Laws of New York Annotated, c. 13, illustrates that any rights conferred thereunder are in the nature of an expectancy, and therefore certainly dependent upon the life expectancies of the couple involved, as well as upon the continuation of their marriage until the death of one of them.

18. As to this, plaintiff notes that there is no credible evidence that Mr. DeFina agreed not to contest the divorce, and there is no indication to that effect in their written agreements. Furthermore, an agreement to that affect would have been illegal and unenforceable under Florida law. Allen v. Allen, 111 Fla. 733, 150 So. 237 (1933) ; Potter v. Potter, 101 Fla. 1199, 133 So. 94 (1931).

erroneous premise that every exchange not precisely equal involves a gift but merely raises the measurement problem discussed in Part III, *infra*, p. 71, 82 S.Ct. p. 1194. Cases in which this Court has held transfers of property in exchange for the release of marital rights subject to gift taxes are based not on the premise that such transactions are inherently gifts but on the concept that in the contemplation of the gift tax statute they are to be taxed as gifts. Merrill v. Fahs, 324 U.S. 308, 65 S.Ct. 655, 89 L.Ed. 963 (1945); Commissioner of Internal Revenue v. Wemyss, 324 U.S. 303, 65 S.Ct. 652, 89 L.Ed. 958 (1945); see Harris v. Commissioner of Internal Revenue, 340 U.S. 106, 71 S.Ct. 181, 95 L.Ed. 111 (1950). In interpreting the particular income tax provisions here involved, we find ourselves unfettered by the language and considerations ingrained in the gift and estate tax statutes. See Farid-Es-Sultaneh v. Commissioner of Internal Revenue, 160 F.2d 812 (C.A. 2d Cir. 1947).

No part of any property transferred to Mr. DeFina was reported in plaintiff's gift tax returns, and defendant therefore argues that there is no authority for the position that "a person may avoid both income and gift tax on the same transfer by taking the position for gift tax purposes that the transfer was made pursuant to a settlement of marital and property rights, and for income tax purposes that the transfer was not made in settlement of marital or property rights, but pursuant to the detached generosity of one of the parties."

This is, incidentally, not an accurate statement of plaintiff's position. She draws attention to the fact that cases like *Duberstein* all occurred in a business context. And she reiterates Gift Tax Regulations § 25.2511–1(g) (1) earlier cited to the effect that:

Donative intent on the part of the transferor is not an essential element in the application of the gift tax to the transfer. The application of the

tax is based on the objective facts of the transfer and the circumstances under which it is made, rather than on the subjective motives of the donor. * * *

In the earlier described Tax Court litigation in which plaintiff is resisting imposition of a gift tax on the transfers to Mr. DeFina, she is not inconsistently arguing that this was not a gift, but rather that it is not *taxable* as a gift because of the exception conferred by section 2516 of the code, which provides:

Where husband and wife enter into a written agreement relative to their marital and property rights and divorce occurs within 2 years thereafter (whether or not such agreement is approved by the divorce decree), any transfers of property or interests in property made pursuant to such agreement—

(1) to either spouse in settlement of his or her marital or property rights, * * *

shall be deemed to be transfers made for a full and adequate consideration in money or money's worth.

And finally, she has acknowledged that the transfer to Mr. DeFina was an income taxable event to the extent that she concedes a gain of $6,758.24.

The foregoing summarizes and frames the issues with respect to Count I. As is true with respect to most cases which reach this court, those issues are closely and finely drawn. By an overwhelming preponderance of the evidence, Florida was the marriage domicile of plaintiff and Mr. DeFina. The facts in the *Davis* case are different, of course, but the principles of that opinion control here. One of those tests calls upon the court to determine whether plaintiff made a gift, and intended to make a gift, to Mr. DeFina in any amount. In making such a determination, one must look to such factors as the existence of a negotiated settlement, the receipt by the taxpayer of admittedly valuable rights, and what she wanted and obtained from the agreement. Also, it is pertinent to

recall what the Supreme Court said in Commissioner of Internal Revenue v. Duberstein, *supra,* although in a business context, with regard to deciding when a transfer is a gift and when not:

> \* \* \* Decision of the issue presented in these cases must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case. \* \* \* [363 U.S. at 289, 80 S.Ct. 1190]

■ On those bases, and founded on the record made in this case, the court determines that plaintiff did not intend to and did not in fact, make any gift to Mr. DeFina. Perhaps the negotiations were not sufficiently adversary to be readily characterized as at "arms length," but they nevertheless featured many of the characteristics of negotiations. Although plaintiff might have, as she now asserts, divorced Mr. DeFina without settling any property on him whatsoever, the fact is that she elected instead to enter into a negotiated marriage settlement, with the tax consequences that follow therefrom. The conferences between plaintiff's lawyer and Mr. DeFina, the agreement by the latter to receive stock instead of money, and the supplemental agreement which had the effect of adjusting and preserving the original agreement, are all factors which indicate a negotiation. Mr. DeFina seems to have viewed the discussions as a negotiated settlement, not the granting of a mere bounty or gift. See the statement of facts, *supra.*

The tangible and property benefits accruing to the plaintiff, as outlined above, were very substantial, and also aided her in avoiding the depletion of other assets. In addition, she desired, and apparently obtained, a consideration which seems to have been very important to her. It·has been specifically found (see finding 39) that she instructed her lawyer to settle in terms of a dollar amount subject to the condition that she would have no difficulty in obtaining

a separation. The "totality" of the facts and circumstances show that this was a significant factor in the transaction. And the events bore out plaintiff's wish and hope. Mr. DeFina did not balk at the settlement, there was no "mud slinging or publicity or notoriety or anything else" (to use his words at the trial of this case), and he did not oppose the divorce or raise any obstacles.

On the whole record, and under the precepts of the *Davis* and *Duberstein* cases, the court concludes, as a matter of fact, that it would be "completely unrealistic" to find, on the "totality of the facts" of this case, that plaintiff intended to make any gift to Mr. DeFina. She negotiated a settlement which proved to be acceptable to her and her then husband. Both obtained significant benefits and advantages. Accordingly, the *Davis* assumption and presumption of equality in consideration must prevail. No sufficient evidence to the contrary has been presented. We are not holding that the *Davis* presumption is conclusive or irrebutable as a matter of law. We are simply holding that, on the record of this particular case involving this particular plaintiff and her settlement with Mr. DeFina, that presumption has not been overcome by adequate evidence when the record is taken as a whole.

For these reasons, it is concluded that plaintiff is not entitled to recover on Count I and her petition with respect thereto should be dismissed.

### Count II—Deductibility of the Legal Fees

As set forth earlier in the detailed statement of facts relating to both counts of this petition, plaintiff would ascribe $33,000 of the $650,000 in legal fees earlier described to nondeductible services, and she urges that the remainder of $617,000 constitutes deductible expense pursuant to section 212 of the code, providing as follows:

> In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

(1) for the production or collection of income;

(2) for the management, conservation, or maintenance of property held for the production of income; or

(3) in connection with the determination, collection, or refund of any tax.

Apparently by coincidence, there being no other explanation in the record, defendant also selects the figure of $33,000 as the amount it will allow as deductible under section 212, and it disallows the remainder of $584,000.

As in the case of Count I, there is little issue here as to the state of the law, and the outcome hinges upon disputes of fact which bear upon the subjective intent and motivations of the plaintiff-taxpayer. Here, however, she is not confronted with the assumptions enunciated in the *Davis* case, and there is furthermore, little credible evidence to rebut her factual contentions and proof.

The facts illustrate that this claim of plaintiff clearly arose in a business rather than a personal context. Plaintiff was settlor of the 1944 trust, entitled to a guaranteed income therefrom even if it was necessary to invade the principal, and further entitled to have her tax liability, of whatever source, satisfied therefrom. She had a general unrestricted testamentary power to appoint the entire remainder, and an immediate right to give 25 percent of the principal to her issue. Although the trust was denominated as irrevocable, it could under the circumstances existing in 1957 be revoked, as it in fact was. She had in effect all of the incidents of ownership except the powers vested in the trustee, and it was the threatened exercise of those powers that motivated her to secure revocation of the trust, and thereby to incur the legal fees here at issue.

Plaintiff had good reason to repose special confidence in oil securities which comprised the bulk of the trust assets. While producing substantial income and supporting her overall tax liability, the corpus of the trust had also grown impressively. The trustee had repeatedly indicated its desire to divest the trust of oil securities in favor of tax exempt bonds, and it had illustrated its ability to act quite independently of plaintiff's wishes in pressing that unsuccessful trust construction proceeding earlier described. Reasonable persons expert in financial matters could differ on how best to "manage" and "conserve" (using the words of section 212) this income-producing property. The trustee wished to convert generally to tax exempt bonds. Although the income from these bonds enjoyed tax benefits, this type of investment would not have the growth potential that the oil securities had long demonstrated and continued to demonstrate. Not to be disregarded was the huge tax liability to be incurred upon sale of the oil securities, because of their relatively low adjusted basis in the hands of plaintiff. In short, plaintiff had good cause to be concerned and alarmed.

Further buttressing the business character of plaintiff's trust revocation expenditures is the fact that they were begun well before her marital difficulties arose. The planning and the consummation of the trust revocation proceedings and ancillary business matters thereafter proceeded quite independently of the later separation and divorce proceedings.

The regulations implementing section 212, when speaking of the conservation of income-producing property, define income as also relating to that which may be realized in subsequent taxable years. They define deductible expenses thereunder as including those "paid or incurred by the taxpayer for the production or collection of income or for the management, conservation, or maintenance of investments held by him for production of income (which are) ordinary and necessary under all the circumstances, having regard to the type of investment and to the relation of the taxpayer to such investment." These expenditures fall within that definition.

As in the case of Count I, both parties rely on an opinion of the Supreme Court to support their respective positions on the deductible character of those expenditures. But the case relied upon, United States v. Gilmore, 372 U.S. 39, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963), does not provide a solution, but rather guidelines for the evaluation of particular facts. *Gilmore,* on its facts, is readily distinguishable from this case. The taxpayer in *Gilmore* sought to deduct attorneys' fees incurred in a contested divorce on the ground that an unfavorable decision in the divorce case would give his wife control over close corporations from which much of his income was derived, and render it unlikely that his car dealership would be renewed. Under its "origin and character" test, the Supreme Court understandably rejected that argument in determining that the expenses were "personal" rather than "business."

As this court recently stated [19] in discussing *Gilmore:*

> * * * The "claim" which the taxpayer in that case had resisted was a divorce action, surely a most "personal" type of lawsuit.
>
> *    *    *    *    *    *
>
> By contrast, in the present case, the issues raised by Cory's claims against Mitchell not only arose out of his "profit-seeking activities," they placed his business career in grave jeopardy.
>
> *   *   *

Defendant looks to the use plaintiff made of part of the trust assets *after* revocation, as establishing a "personal" motive for the revocation. It refers to the transfer of oil stock to Mr. DeFina, and to the trusts created for her children. As earlier indicated, however, plaintiff's marital difficulties arose considerably after she had begun action to revoke the trust, and there is no evidence that the revocation action was motivated by the marital difficulties. Moreover, the history of this case illustrates that she relinquished stock rather than cash to Mr. DeFina on the occasion of the later marital settlement, because she simply did not have the liquidity to do otherwise.

Similarly the transfer of oil stocks to trusts for her children was the price she was obliged to pay for withdrawal by the trustee of its appeal from the revocation decree. Furthermore, the new trustees included her attorney Mr. Lee, the trusts contained the same cautionary language with respect to sale of the oil securities, and she would have every reason to believe that her wishes would be honored with respect to retention of the oil securities in the case of these new trusts for her children.

The Government also argues on the authority of Knetsch v. United States [20] that these expenses were not deductible because they were not designed to give rise to a profit or loss. *Knetsch* is readily distinguishable. It involved expenditures in a scheme in which the only economic gain to be derived would result from a tax reduction. Here, in contrast the expenditures were incurred, in the words of section 212, for the management, conservation, or maintenance of income-producing property, and to frustrate proposals of the trustee motivated by tax-saving considerations.

Next defendant contends that if the legal expenses it has disallowed are not personal "they are capital in nature and must be capitalized." It is argued that plaintiff's primary purpose in the trust revocation litigation was to perfect title.[21] But here once again this contention finds no support in the record. In Malat v. Riddell,[22] the Supreme Court defined "primarily" in this context as a

19. Mitchell v. United States, 408 F.2d 435, 440–441, 187 Ct.Cl. 342, 351–352 (1969).

20. 348 F.2d 932, 172 Ct.Cl. 378 (1965), cert. denied, 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966).

21. *Cf.* Income Tax Reg. § 1–212–1(k).

22. 383 U.S. 569, 572, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966).

search for the principal purpose, or the one of first importance.[23]

The record is clear that plaintiff's primary purpose in seeking revocation of the trust was to prevent the sale of the oil securities. She already possessed, as earlier listed, all of the important incidents of ownership but she could not prevent a sale of the bulk of the corpus of the trust. Plaintiff's contemporary correspondence, as well as her sworn testimony, reflected a sincere belief that the stock would be sold, and an urgent desire to prevent the sale. The effort to obtain legal title to the stock was merely incidental to that primary purpose.

Defendant's final argument is that plaintiff has failed to establish that the Government's allocation between allowable and unallowable deductions is arbitrary or erroneous. There is a hint of arbitrary action in the allocation by defendant of the same sum of $33,000 to deductible fees, as the plaintiff had previously conceded as the figure representing her personal and nondeductible fees. In Carpenter v. United States,[24] the taxpayer's attorney testified that 70 percent of his services related to deductible tax advice made in connection with the taxpayer's divorce and separation proceedings. This allocation was accepted by the court which stated:

> * * * The allocation by plaintiff's counsel that at least seventy percent of his services related solely to plaintiff's tax problems was conservative and reasonably accurate and there is no evidence that in making the allocation plaintiff's counsel acted in bad faith. * * *

Here, also, a partner in the law firm testified in detail and at length as to the allocation of the overall fee. His testimony is unrebutted on the record. The sum of $33,000 was allocated by him to nondeductible services pertaining to plaintiff's uncontested divorce. Defendant had no objection to this and stipulates it, as well as concurring in plaintiff's proposed finding to that effect.

Furthermore, defendant has stipulated and concurred in a proposed finding of the plaintiff as follows:

> The fee of $650,000 was a reasonable fee for the legal services described in the statement of services and $33,000 was a reasonable fee for the services described in the statement as "non-deductible" (Tr.309). $617,000 was, therefore, a reasonable fee for the services described in the statement as "deductible" (Tr.309).

Since it has been determined that the portion of this $617,000 attributable to the trust revocation is deductible, and since the remainder of this $617,000 is attributable to tax and similar services admittedly deductible, it is purely academic and unnecessary to allocate the deductible parts of a deductible whole. Any combination of labelings within the concededly reasonable and deductible sum of $617,000 would produce the same result.

■ All of the foregoing considered, it is concluded that plaintiff is entitled to judgment on Count II, the amount of recovery to be determined pursuant to Rule 131(c) (2).

SKELTON, Judge (concurring in part).

I join in the opinion of the majority in its disposition of Count II of plaintiff's petition regarding the taxability of the attorney fees involved in this case.

I agree with the result reached by the majority on Count I of the petition with reference to taxes due by plaintiff in connection with the separation and marital and property rights agreements be-

23. See also Bliss v. United States, 373 F.2d 936, 179 Ct.Cl. 353 (1967); Manufacturers Hanover Tr. Co. v. United States, 312 F.2d 785, 160 Ct.Cl. 582 (1963); Loyd v. United States, 153 F. Supp. 416, 139 Ct.Cl. 626 (1957); Industrial Aggregate Co. v. United States, 284 F.2d 639 (8th Cir. 1960).

24. 338 F.2d 366, 370, 168 Ct.Cl. 7, 14 (1964).

tween plaintiff and her former husband, Mr. DeFina, but arrive at the conclusion by a somewhat different route.

The plaintiff proposed a settlement with DeFina through her attorney, Mr. Lee, in which she proposed to pay him $1,700,000, less what she had invested in DeFina's Florida project. This offer was expressed in dollars and not in property, as the plaintiff had instructed Lee to settle in terms of a dollar amount rather than for shares of stock. Later, Lee suggested to DeFina that he accept Standard Oil Company (New Jersey) stock in lieu of cash if he was going to invest it anyway. After he asked and was assured by Lee that there would be "no tax problems," DeFina agreed to accept the shares of stock in an amount equal to the sum of money agreed upon ($1,321,031.25). The stock was transferred and accepted as agreed.

This arrangement was very significant and had tremendous tax consequences. If DeFina had refused to take the stock and had insisted on cash, plaintiff would have had to have sold her stock in which she had a cost basis of only $55,-426.13 in order to obtain the required $1,321,031.25 in cash. This would have resulted in her having to pay a long-term capital gains tax on the sale. Her attorney, Mr. Lee, is bound to have realized this, because the record shows he was a highly skilled lawyer. By persuading DeFina to take the stock, he avoided this tax for his client that would have resulted from a sale of the stock on the open market. If the transfer was a gift, this arrangement merely transferred the tax problem from plaintiff to DeFina. This is true because DeFina, as a donee, would take the stock with the same low cost basis of $55,426.13 that his donor (plaintiff) had in the stock. This would have the ultimate result of requiring DeFina to pay a high capital gains tax when he finally sold the stock at market value. As a matter of fact, this is exactly what happened. He sold some of the stock in 1958 which resulted in a pending lawsuit between him and the government in which he is

contesting $32,393.47 in income taxes, and a further sale of more of the stock in 1959 caused a pending Tax Court suit involving a deficiency in income taxes in the sum of $64,506.61. DeFina has been given to understand he will owe more taxes in future years if plaintiff wins this case (Count I). On the other hand, government attorneys have informed DeFina that if plaintiff loses on Count I here, the government would abandon the tax claims against him. I assume that in the latter event the government, on requiring the plaintiff to pay the tax on the transfer of the stock to DeFina by considering it a sale, would allow him to take the stock at a new cost basis, namely the price plaintiff obtained for it on the sale ($1,321,031.-25), and as a consequence, DeFina would owe little if any taxes as a result of his selling the stock.

All of this requires a close scrutiny of the settlement agreement plaintiff made through attorney Lee with DeFina regarding taxes. Our trial commissioner found that DeFina was an educated man, having a university degree in business administration and three or four years of additional post graduate work, and that he considered himself to be an expert in tax law. We do know that he was concerned about the tax consequences of his accepting stock instead of cash, otherwise he would not have raised the question. The long and short of it is that plaintiff and DeFina included in their agreement the understanding that DeFina would have "no tax problems" if he would accept the stock instead of money. The effect of this agreement was that plaintiff would pay any tax that might be due. Plaintiff's argument that the transfer was a gift is inconsistent with her agreement to pay the tax, because if the transfer was a gift there was no way that DeFina could avoid having tax problems when he sold the stock.

In my opinion, the agreement which in effect required plaintiff to pay any tax due as a result of the stock transfer, completely negates any intent on the part

of plaintiff to make a gift of the stock to DeFina. It is more logical to conclude that plaintiff agreed, at least in effect, that the transaction was a sale and that she would pay the required tax. Certainly, her attorney, who was speaking for her, is bound to have understood that this was the effect of the agreement.

Consequently, the court is correct in holding that United States v. Davis, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335, rehearing denied, 371 U.S. 854, 83 S.Ct. 14, 9 L.Ed.2d 92 (1962) requires that judgment be entered, that plaintiff is not entitled to recover on Count I, and that her petition be dismissed to that extent.