GARVEY, INC.

v.

The UNITED STATES.

H. Bernerd FINK, et al.

v.

The UNITED STATES.

GARVEY ELEVATORS, INC.

v.

The UNITED STATES.

GARVEY INTERNATIONAL, INC.

v.

The UNITED STATES.

James S. GARVEY, et al.

v.

The UNITED STATES.

Willard W. GARVEY, et al.

v.

The UNITED STATES.

George A. LINCOLN, et al.

v.

The UNITED STATES.

Nos. 389–79T to 393–79T, 395–79T and 396–79T.

United States Claims Court.

Jan. 21, 1983.

Robert L. Howard, Wichita, Kan., for plaintiffs. Mark G. Ayesh and Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., of counsel.

Bruce W. Reynolds, Washington, D.C., with whom was Asst. Atty. Gen., Glenn L. Archer, Jr., Washington, D.C., for defendant. Theodore D. Peyser, Washington, D.C., of counsel.

## OPINION

PHILIP R. MILLER, Judge:

The corporate and individual plaintiffs in these consolidated cases filed suit to recover an aggregate of $3,447,102 in federal income taxes paid for 1969 through 1977. The cases present issues relating to consolidated return regulations and private annuities. The facts on all issues have been stipulated and insofar as pertinent are stated in the opinion.

## I

### The Adjustment To Basis Of The Subsidiary Corporation's Stock

On January 4, 1966, an affiliated group of corporations was formed with Garvey, Inc.

(Garvey) as the common parent.[1] Outside this group was another parent-subsidiary chain: Petroleum, Inc. (Petroleum) and its wholly owned subsidiary, Lincoln Grain, Inc. (Lincoln). On January 5, 1966, Garvey acquired from Petroleum all of the outstanding Lincoln stock in exchange for 14 percent of Garvey's own stock, thereby bringing Lincoln into the affiliated group. Immediately before this exchange, the basis of the Lincoln stock in the hands of Petroleum was $2,436,073.

Two years later, on March 28, 1968, Garvey issued 10,404,000 shares of its common stock to the Petroleum shareholders in exchange for 100 percent of the Petroleum stock.[2] This transaction brought Petroleum into the affiliated group and produced reciprocal stock ownership: Garvey owned 100 percent of Petroleum, which in turn owned 14 percent of Garvey. As of the date of the exchange, Petroleum had accumulated earnings and profits of $4,700,000, but the Petroleum shareholders had a collective basis in their Petroleum stock of only $249,602. Because the Petroleum stock was acquired by Garvey in an exchange of stock constituting a reorganization under § 368(a)(1)(B) of the Internal Revenue Code of 1954 (I.R.C. or the Code) (26 U.S.C.)[3], pursuant to I.R.C. § 362(b)[4] Garvey took a carryover basis of $249,602 as its basis for its Petroleum stock.

The affiliated group filed consolidated tax returns beginning with the 1966 tax year. Subsequently, the members of the group engaged in several transactions which give rise to the issues in dispute.

Specifically, on November 19, 1968, Petroleum distributed its Garvey stock (14 percent) as a dividend to Garvey. The amount of this distribution was $2,426,073, and the distribution was made from Petroleum's preaffiliation earnings and profits, i.e., the earnings and profits accumulated by Petroleum before it became a member of the Garvey group. On August 1, 1970, Garvey contributed all of its Petroleum stock to three of its other wholly owned subsidiaries. On September 22, 1971, Petroleum redeemed this stock from two of the subsidiaries for $2,551,000 ($1,445,961 in cash and the remainder in property). It is stipulated that these redemptions constituted dividend distributions and that these distributions also were made from Petroleum's preaffiliation earnings and profits.

I.R.C. § 1502 provides:

Regulations

The Secretary or his delegate shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

The consolidated return Treasury Regulations promulgated by the Secretary pursu-

---

1. This company is not one of the corporate plaintiffs herein. Rather, plaintiff Garvey, Inc. was formed in 1972 as a result of a reorganization involving the affiliated group. As used herein, the term "Garvey" applies to the 1966 parent corporation.

2. At the time of this exchange, the shareholders of Petroleum included the same persons who owned Garvey, but the proportion of stock held by each person in each corporation was not the same.

3. Hereinafter and unless otherwise specified, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year in issue.

4. I.R.C. § 362(b) provides:

Transfers to Corporations.—If property was acquired by a corporation in connection with a reorganization to which this part applies, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer. This subsection shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the issuance of stock or securities of the transferee as the consideration in whole or in part for the transfer.

ant to I.R.C. § 1502 provide the tax consequences of the above-described distributions by Petroleum. Regulations which deal with investment adjustments, and particularly Treas.Reg. § 1.1502–32, T.D. 6909, 1967–1 C.B. 240, provide in pertinent part as follows:

Investment Adjustment

(a) *In general.* As of the end of each consolidated return year, each member owning stock in a subsidiary shall adjust the basis of such stock in the manner prescribed in this section. * * * The amount of such adjustment shall be the difference between the positive adjustment described in paragraph (b)(1) or (c)(1) of this section, whichever is applicable, and the negative adjustment described in paragraph (b)(2) or (c)(2) of this section, whichever is applicable. Such difference is referred to in this section as the "net positive adjustment" or the "net negative adjustment", as the case may be.

(b) *Stock which is not limited and preferred as to dividends.*—

\*   \*   \*   \*   \*   \*

(2) *Negative adjustment.*—The negative adjustment with respect to a share of stock which is not limited and preferred as to dividends shall be the sum of—

\*   \*   \*   \*   \*   \*

(iii) Distributions made by the subsidiary during the taxable year with respect to such share out of earnings and profits of the subsidiary—

\*   \*   \*   \*   \*   \*

(b) Accumulated in preaffiliation years of the subsidiary.

\*   \*   \*   \*   \*   \*

(e) *Application of adjustment.*—(1) *Net negative adjustment.*—A member owning stock in a subsidiary shall apply its net negative adjustment to reduce its basis for such stock. Any excess of such adjustment over basis is herein referred to as such member's "excess loss account".

Because the distributions from Petroleum were made out of its preaffiliation earnings and profits, the investment adjustment rules required a reduction to the basis of the Petroleum stock by the amount of the distributions. Since that amount exceeded Garvey's basis in the stock, an excess loss account was created. The creation of the excess loss account in itself did not generate any tax liability, for, pursuant to Treas. Reg. § 1.1502–19(a), T.D. 6909, *supra,*[5] the member's excess loss account is included in income, generally as gain from the sale of stock, only upon the "disposition" of the stock as defined in Treas.Reg. § 1.1502–19(b). In 1972 the group terminated its affiliated status, a transaction considered a "disposition" under Treas.Reg. § 1.1502–19(b)(2)(vi). Accordingly, the members were required to include in their gross income for their taxable year ending March 31, 1972, the excess loss account previously discussed. They failed to do so, however, and the Commissioner on audit included the excess loss account in the group's income. The validity of the regulation which requires these adjustments is at issue herein.

The purpose of the investment adjustment regulation is self-evident. Corporations in an affiliated group filing consolidated returns are treated as departments of a single entity. *See American Standard, Inc. v. United States,* 220 Ct.Cl. 411, 418, 602 F.2d 256, 261 (1979). Generally transactions between such corporations in a consolidated return year are given no tax effect, and, in particular, a dividend from one member to the other is not taxable to the recipient. Treas.Reg. § 1.1502–14(a), T.D.

**5.** Treas.Reg. § 1.1502–19 provides in pertinent part as follows:

Excess Losses.

(a) *Recognition of income.*—(1) *In general.* —Immediately before the disposition (as defined in paragraph (b) of this section) of stock of a subsidiary, there shall be included in the income of each member disposing of such stock that member's excess loss account (determined under §§ 1.1502–14 and 1.1502–32) with respect to the stock disposed of.

6909, *supra.*[6] However, it is a basic tenet of the tax law that earnings and profits accumulated when there has been no such affiliation are taxable whenever distributed (*see Commissioner v. Sansome,* 60 F.2d 931 (2d Cir.1932) and *Commissioner v. Phipps,* 336 U.S. 410, 69 S.Ct. 616, 93 L.Ed. 771 (1949)), and nothing in the statute allowing affiliated groups to file consolidated returns would suggest that Congress intended such returns to be used as a device to insulate from income taxation the distribution of earnings and profits accumulated in preaffiliation years. Accordingly, giving due regard to both principles, the regulations reiterate the scheme of § 1016 of the Code, which provides:

> Adjustments to basis
>
> (a) General rule.—Proper adjustment in respect of the property shall in all cases be made—
>
>    \*     \*     \*     \*     \*     \*
>
> (4) [I]n the case of stock \* \* \* for the amount of distributions previously made which, under the law applicable to the year in which the distribution was made, either were tax-free or were applicable in reduction of basis \* \* \*.

In other words, the regulation states that even if the distribution of preaffiliation earnings and profits from an affiliate corporation to a parent corporation in a consolidated return year was not taxable when received, upon the disposition of the affiliate's stock the parent's basis for the stock is reduced by the amount it has already received free of tax.

The basis adjustment rules seek to achieve the broad objective of preventing tax avoidance that otherwise might occur through the use of the consolidated return. Authority to so regulate was first delegated

to the Secretary by § 141(b) of the Revenue Act of 1928, ch. 852, 45 Stat. (part 1) 791, 831, the predecessor to I.R.C. § 1502. The Conference Report that accompanied § 141(b) made clear that Congress expected the Secretary to prescribe regulations dealing with—

> [t]he extent to which gain or loss shall be recognized upon the sale by a member of the affiliated group of stock issued by any other member of the affiliated group or upon the dissolution (whether partial or complete) of a member of the group; \* \* \* [and] the extent to which and the manner in which gain or loss is to be recognized, upon the withdrawal of one or more corporations from the group, by reason of transactions occurring during the period of affiliation \* \* \*.

H.R.Rep. No. 1882, 70th Cong., 1st Sess. 16–17, 1939–1 C.B. (part 2) 444, 449. Nothing in subsequent revisions to the 1928 Act indicates any intent to limit the scope of this authority. *See Regal, Inc. v. Commissioner,* 53 T.C. 261, 266 (1969), *aff'd per curiam,* 435 F.2d 922 (2d Cir.1970).

Treas.Reg. § 1.1502–32(b)(2)(iii)(b) fits squarely within the type contemplated by Congress, for it prevents tax avoidance by fixing the extent to which and the manner in which plaintiff,[7] upon disaffiliation, is to recognize gain or loss by reason of transactions that took place during the period of affiliation. Such transactions include the dividend distributions that, pursuant to Treas.Reg. § 1.1502–14(a), went untaxed due to the filing of the consolidated tax return. The regulation therefore insures that a distribution that would have been taxable absent the consolidated return does not completely escape taxation through the use of the consolidated return.[8]

---

**6.** Treas.Reg. § 1.1502–14 provides in pertinent part as follows:

> Stock, Bonds, and Other Obligations of Members.
>
> (a) *Intercompany distributions with respect to stock.*—(1) *Dividends.*—A dividend distributed by one member to another member during a consolidated return year shall be eliminated.

This provision dates back to the consolidated return regulations under the Revenue Act of 1936. Treas.Reg. 97 Art. 31(b).

**7.** In this portion of the opinion, the term "plaintiff" refers only to plaintiff Garvey, Inc.

**8.** The consolidated return regulations also convert the income from ordinary income to capital gain. *See* Treas.Reg. § 1.1502–19(a)(1).

Since § 1502 specifically directs the Secretary to prescribe regulations as he may deem necessary in order clearly to reflect the income tax liability of any affiliated group of corporations making a consolidated return both during and after the period of affiliation and to prevent avoidance of such tax liability, such regulations are legislative in character with the force and effect of law, and the Secretary is allowed wider discretion in their promulgation than in the case of merely interpretative regulations. *Union Electric Co. v. United States*, 158 Ct.Cl. 479, 486, 305 F.2d 850, 854 (1962); *American Standard, Inc. v. United States, supra*, 220 Ct.Cl. at 416–17, 602 F.2d at 260. However, of course even that discretion is not unlimited.

Plaintiff concedes that "the regulations in this complex area should be sustained unless clearly unreasonable" and that the negative adjustment rules requiring that basis be decreased for distributions out of earnings and profits accumulated by the subsidiary in preaffiliation years of the subsidiary are "logical" and "necessary to prevent double losses and dividend stripping"[9] —except when the parent's basis for the subsidiary's stock is carried over from the prior stockholders and is less than the fair value of the subsidiary's stock at the time acquired.

Plaintiff says that when a corporation buys all of the stock of another corporation for cash, its cost is generally the value of all of the acquired corporation's property, which consists of the original assets plus the cash and other assets acquired by the subsidiary corporation with its accumulated earnings and profits. If the assets derived from the earnings are then paid out to the parent by way of untaxed dividends, the parent receives back part of its cost, and its remaining cost is attributable only to the subsidiary's remaining assets. Therefore, plaintiff concedes that it is logical to reduce the parent's basis for the subsidiary's stock by the amount of the untaxed distribution of preaffiliation earnings. However, plaintiff argues, when the parent issues its own stock having equivalent value for all of the stock of the subsidiary, its basis should not be reduced by the distribution of preaffiliation earnings because the parent's basis for its purchase is reduced (by § 362(b)[10]) to the subsidiary's former stockholders' basis for their stock and already excludes the value of the subsidiary's accumulated earnings. Therefore, plaintiff contends, if it disposes of the subsidiary's stock for what it paid less the value of the property received as a dividend, the second reduction in basis causes it to be taxed on "phantom gain".

Although the argument is not without superficial appeal, it is meretricious. First, the assertion that the former stockholders' basis for their stock necessarily excludes the value of the subsidiary's accumulated earnings and profits is true only if they were the original stockholders of the subsidiary. It is not accurate if the former stockholders

**9.** A double loss deduction occurs if the loss incurred in a consolidated return year by a subsidiary is used first to offset the taxable income of the group pursuant to Treas.Reg. § 1.1502–12, T.D. 6894, 1966–2 C.B. 362, and again to produce a loss if the subsidiary is sold by the parent corporation for an amount that reflects the loss and is less than the parent's original investment in the subsidiary. For example, Corporation P acquires Corporation S for $500. In a consolidated return year, P has taxable income of $300 and S incurs a $200 loss. Under the consolidated return regulations, the taxable income of the group is $100 ($300–$200). If P then sells S, presumably P could only get $300 (its original $500 value minus the $200 loss). P would then be able to claim a $200 loss on the sale, thereby utilizing the loss twice. This abuse was prohibited by *Charles Ilfeld Co. v. Hernandez*, 292 U.S. 62, 54 S.Ct. 596, 78 L.Ed. 1127 (1934) and now is codified in the consolidated return regulations. Treas.Reg. §§ 1.1502–19, 1.1502–32.

Dividend stripping is the practice by which a corporation purchases a subsidiary for a price that reflects the subsidiary's accumulated earnings and profits, receives a distribution of those earnings and profits tax-free under Treas.Reg. § 1.1502–14(a) (which eliminates dividend distributions between members of the group), sells the subsidiary for its remaining value and claims a loss. *See Waterman Steamship Corp. v. United States*, 430 F.2d 1185 (5th Cir.1970), *cert. denied*, 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1971). This abuse also is prohibited by Treas.Reg. §§ 1.1502–19, 1.1502–32.

**10.** *See* n. 4, *supra*.

bought their stock from others and some or all of the earnings were accumulated before such purchase.

More important, the reduction in basis for the stock which creates the "phantom gain" is not the reduction required by the regulation but the reduction required by the statute, i.e., § 362(b). This does not depend on there being an affiliated group, consolidated returns and preaffiliation earnings. The following examples serve to illustrate this:

(1) Assume that sole stockholder SH acquired the stock of Corporation S for $10,000 and that subsequently S accumulated $10,000 in earnings. If Corporation P then issues to SH P stock having a $20,000 value in exchange for all of SH's shares, pursuant to I.R.C. § 362(b) P's basis for the S shares remains the same as that of SH, $10,000. If P then resells the S stock to Y for $20,000, P has a taxable gain of $10,000, even though it has received no more than what it paid.

(2) Assume the same initial facts but that after P acquired the S shares S distributes to P the $10,000 in earnings as a dividend. Since the S assets are thereby depleted, P receives no more than $10,000 when it resells the S shares to Y. Thus, in such a situation P still has $10,000 of taxable income, i.e., the dividend from S, even though the sum of the dividend distribution and resale price of the S stock equals no more than what P paid for the stock in the first place.

(3) Assume again the same initial facts but that after P acquired the S shares P and S become an affiliated group, that they file a consolidated income tax return, and that during the consolidated return year S distributes to P as a dividend the $10,000 in preaffiliation earnings. When thereafter P sells the S shares, because the S assets have been depleted by the dividend P receives no more than $10,000 for the shares. Under Treas.Reg. § 1.1502–32, P's basis for the S stock is reduced to 0. Therefore, its taxable income is $10,000, the same as in the previous examples, and the operation of the regulation has not affected that amount.

Prior to the enactment of the predecessors to § 362(b), P's basis for the S stock in Examples (1) and (2) was $20,000. But Congress became concerned that the reorganization section was being used as a device to deprive the government of its proper taxes by permitting an increased basis for assets and for stock of one corporation acquired by another in exchange for stock in a tax-free reorganization. Therefore, in § 204(a)(7) of the Revenue Act of 1924, ch. 234, 43 Stat. 253, 259, Congress provided that if property is acquired by a corporation in connection with a reorganization by the issuance of its stock and immediately thereafter the transferor or transferors are in control of the corporation, then the corporation's basis for the property shall remain the same as it would be in the hands of the transferor. The House Ways and Means Committee explained the purpose of the measure:

(2) The provisions of the reorganization section have been rewritten to prevent the use of the section to escape proper taxation by increasing the basis for depreciation or depletion or by increasing the basis for determining gain or loss from the sale of assets transferred in connection with a reorganization or by distributing as capital gains what are in effect dividends out of earnings.[11]

H.R.Rep. No. 179, 68th Cong., 1st Sess. 7, 1939–1 C.B. (part 2) 241, 246. The Committee also noted as follows:

Under the existing law, if the A Corporation owns assets which cost it $10,000 but which are now worth $20,000, it can reorganize into the B Corporation, exchanging shares of stock of the B Corporation for the shares of stock of the A Corporation. Neither Corporation A nor its stockholders realize any taxable gain from the reorganization. The B Corporation, however, can set up the assets received in the reorganization on its books at their market value—that is, $20,000—

---

11. The Senate Finance Committee report contains substantially the same language. S.Rep.

No. 398, 68th Cong., 1st Sess. at 7, 18, 1939–1 C.B. (part 2) 266, 278–79.

and use that amount as the basis for determining the gain or loss from the subsequent sale of the assets and for determining depreciation and depletion. Under paragraph (8) of the draft, however, Corporation B must set up the assets on its books at $10,000, their basis in the hands of Corporation A, and must use that amount as the basis for determining the gain or loss from the subsequent sale of the assets and for determining depreciation and depletion.

*Id.* at 17, 1939–1 C.B. (part 2) at 253.

A statement dated March 6, 1924, prepared for the use of the Senate Finance Committee by the Treasury Department, also explained the purpose of the measure:

Section 203 of the bill provides that the gain or loss from exchanges made in connection with the reorganization, whether the exchange is made by the corporation a party to the reorganization or by the stockholders of such corporation, shall not be recognized. The theory underlying the provisions of this section is that the new corporation, that is, the reorganized corporation, is as a matter of fact the same as the old corporation, and that in substance there has been no real change which would result in a realization of profit by the corporations or by their stockholders. The same theory should be applied in determining the basis of the assets transferred in connection with the reorganization. If the new corporation is in substance the same as the old, the basis for determining gain or loss and for depreciation and depletion of the assets of the new corporation should be the same as the basis of those assets in the hands of the old corporation prior to the exchange. The provisions of this paragraph limiting the basis of the assets transferred in connection with the reorganization to the basis in the hands of the transferor represent the logical counterpart of the provisions of section 203 which exempt from tax exchanges made in connection with a reorganization.[12]

Although the 1924 Committee reports indicate that "property" was intended to include stock, in § 113(a)(7) of the Revenue Act of 1928, ch. 852, 45 Stat. 791, 819–20, Congress clarified the 1924 measure to remove any doubt that the carryover of basis requirement applies to a stock for stock reorganization. See reports of Ways and Means Committee, H.R.Rep. No. 2, 70th Cong., 1st Sess. 18–19, 1939–1 C.B. (part 2) 384, 396–97, and Senate Finance Committee, S.Rep. No. 960, 70th Cong., 1st Sess. 27–28, 1939–1 C.B. (part 2) 409, 427–28. And in 1938 Congress removed the requirement that the transferor of the property or stock retain control over it, in order for the basis to carry over in the reorganization, bringing the statute to the format in which it now reads in § 362(b). Rev. Act of 1938, § 113(a)(7), ch. 289, 52 Stat. 447, 491.

Plaintiff's argument comes down to this: Plaintiff has already suffered a statutory reduction in basis because it acquired the stock of its affiliate in a stock-for-stock non-taxable reorganization. Therefore, although generally it is logical for the regulations to require reduction of the basis of an affiliate's stock for the parent's tax-free receipt of a distribution of its affiliate's earnings in a consolidated return year, plaintiff should be entitled to credit for the prior reduction. But as shown, the purposes of the two reductions in basis are unrelated and may exist independently or concurrently. It seems clear that, although couched in terms of an attack on Treas.Reg. § 1.1502–32, plaintiff's argument really is an effort to nullify the effects of § 362(b), a statute dating back to 1924. The validity of that statute, however, has never seriously been questioned and even plaintiff does not challenge it directly here.

Although, as previously mentioned, plaintiff in its main brief conceded that the provisions of Treas.Reg. § 1.1502–32(b)(2)(iii)(b) requiring a reduction in the basis because of the receipt of an untaxed

---

**12.** Reprinted in *Seidman's Legislative History of Federal Income Tax Laws: 1938–1861,* p. 704 (J.S. Seidman ed. 1938).

distribution of preaffiliation earnings are logical except where the member has a carryover basis in the affiliate's stock, in its reply brief plaintiff urges for the first time that the regulation is at odds with § 243 of the Code. That section allows to a corporation receiving a taxable dividend from another corporation a deduction of 85 percent of the amount of the dividend. Plaintiff asserts that applying the 48 percent corporate maximum tax rate in effect during 1968–71 to the 15 percent remainder results in a 7.2 percent tax on the dividends, whereas the effect of the regulation's reduction in the basis of the affiliate's stock because of the untaxed dividend was to subject the increased gain on the disposition in 1972 to a 30 percent capital gains tax.

Plaintiff contends that this increased tax violates the principle, enunciated by the Tax Court in *Joseph Weidenhoff, Inc. v. Commissioner*, 32 T.C. 1222, 1242 (1959), that the Secretary has no authority—

> to prescribe a regulation which will * * * impose a tax on income that would not otherwise be taxed (by limiting the excess profits credit) simply because the taxpayers exercise the privilege of filing consolidated returns, unless it is to prevent tax avoidance.

But the quotation lays down no principle applicable to consolidated return regulations generally. It was merely an expression of the court's frustration over its inability to understand the purpose of a regulation limiting the excess profits credit of corporations becoming members of an affiliated group after a particular date and the failure of both the regulations and the Commissioner to explain such purpose. Therefore, it said, "in the absence of possible tax avoidance or some necessity for its use to properly determine the tax liability, we do not think [the regulation] can be applied, without explanation, in the absolute discretion of the Commissioner." *Id.*

The obvious purpose of the regulation here at issue, which reduces the plaintiff's basis of its stock in its subsidiary for untaxed dividends from preaffiliation earnings of the subsidiary, is to prevent tax avoidance.

The election to file a consolidated return for an affiliated group inherently carries with it both advantages and disadvantages as compared to filing separate returns. For example, consolidation offers the opportunity to offset losses of one company against profits of another (*see* Treas.Reg. § 1.1502–12, T.D. 6894, 1966–2 C.B. 362); deferral of gain on intercompany transactions (*see* Treas.Reg. § 1.1502–13, T.D. 6894, *supra*); and group use of the foreign tax credit and charitable contribution limitations (*see* Treas.Reg. § 1.1502–11, T.D. 6894, *supra*). On the other hand, consolidation subjects a member to deferral of its loss deduction on intercompany transactions (*see* Treas.Reg. § 1.1502–12); adjustments to opening and closing inventories for intercompany profits (*see* Treas.Reg. § 1.1502–18, T.D. 6894, *supra*); and possible reduction of loss carryover (*see* Treas.Reg. § 1.1502–21, T.D. 6894, *supra*).[13] In promulgating consolidated return regulations, the Secretary is not obligated to offer a taxpayer all the benefits of consolidation while simultaneously preserving for it all deductions and benefits of separate returns. As the court stated in *Georgia-Pacific Corp. v. Commissioner*, 63 T.C. 790, 802 (1975), the affiliated group that voluntarily elects to file a consolidated return "must now take the bitter with the sweet."

More important, since the argument based on § 243 challenges the validity of the regulation generally rather than merely its operation as applied to a carryover basis, it is obviously a different claim from the one made earlier in the case and from that made administratively; and defendant has not waived the variance.

---

**13.** That the filing of a consolidated return may cause changes in income tax liability was noted by the Court of Claims in *American Standard, Inc. v. United States*, 220 Ct.Cl. 411, 420 n. 6 and 422 n. 12, 602 F.2d 256, 262–63 n. 6 and 264 n. 12 (1979), despite its citation to the *Weidenhoff* opinion.

I.R.C. § 7422(a) provides that no suit shall be maintained in any court for the recovery of any internal revenue tax alleged to have been collected erroneously until a claim for refund has been filed with the Secretary or his delegate according to regulations established pursuant to law. The applicable regulation is Treas.Reg. § 301.6402–2 (1978), which in pertinent part provides as follows:

> (b) *Grounds set forth in claim.* (1) No refund or credit will be allowed * * * except upon one or more of the grounds set forth in a [timely] claim * * *. The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof * *.

The validity of this regulation has been upheld repeatedly. *Angelus Milling Co. v. Commissioner,* 325 U.S. 293, 65 S.Ct. 1162, 89 L.Ed. 1619, *reh'g. denied,* 325 U.S. 895, 65 S.Ct. 1162, 89 L.Ed. 2006 (1945); *Real Estate-Land Title & Trust Co. v. United States,* 309 U.S. 13, 17–18, 60 S.Ct. 371, 373, 84 L.Ed. 542 (1940); *Disabled American Veterans v. United States,* 227 Ct.Cl. 474, 475, 650 F.2d 1178, 1179 (1981); *Forward Communications Corp. v. United States,* 221 Ct.Cl. 582, 623–24, 608 F.2d 485, 508 (1979). In *Union Pacific R.R. v. United States,* 182 Ct.Cl. 103, 108–09, 389 F.2d 437, 442 (1968), the Court of Claims stated:

> It is an undisputed general rule that a ground for refund neither specifically raised by, nor comprised within the general language of, a timely formal or informal application for refund to the Internal Revenue Service cannot be considered by a court in which a suit for refund is subsequently initiated. [Citations omitted.] The rule that a taxpayer cannot present one ground for refund in its claim and a different ground in its petition is designed both to prevent surprise and to give adequate notice to the Service of the nature of the claim and the specific facts upon which it is predicated, thereby permitting an administrative investigation and determination. [Citation omitted.] In addition, the Commissioner

is provided with an opportunity to correct any errors, and if disagreement remains, to limit the scope of any ensuing litigation to those issues which have been examined and which he is willing to defend. [Citations omitted.]

It is not enough that the government was given an opportunity to respond to the plaintiff's new claim by a supplemental memorandum in this lawsuit. Notice of the particular claim must have been filed with the Internal Revenue Service. *Disabled American Veterans v. United States, supra; Union Pacific R.R. v. United States, supra.*

Prior administrative consideration of such a claim is particularly appropriate here. For, even though plaintiff claims the regulation is invalid in its entirety, that would not be the only possible consequence of their argument. Rather, the regulation could be invalid only to the extent that it required a basis reduction greater than that needed to reflect the availability of the 85 percent deduction of § 243. Alternatively, giving effect to § 243 might necessitate allowing the parent the option to include the intercorporate dividend in income at the time received rather than subject itself to the reduction in basis of its affiliate's stock. Perhaps the parent could be given the choice retroactively, or some other equitable adjustment should be made pending promulgation of new regulations. Possibly such an adjustment in favor of the plaintiff equivalent to what it could have had if it had not filed a consolidated return would necessitate its giving up other related benefits in the consolidated return context. If the parent received the dividend free of tax in one year but was entitled to the dividend deduction as an offset to capital gain on the disposition of the affiliate's stock 20 years later, would the government be entitled to a credit because the parent had tax-free use of the funds for so long? Plaintiff has offered no guidelines as to the manner in which the basis should be adjusted to reflect its § 243 argument, nor has it suggested how the excess loss account would be treated upon disposition of the Petroleum stock. These questions make clear the wis-

dom of allowing such an issue to be addressed first by the Commissioner rather than by the court, which has not been delegated the responsibility of drafting consolidated return regulations and has only limited flexibility.

Plaintiff also claims that Petroleum made the distributions in reliance on 1968 and 1971 published proposals by the Treasury to amend Treas.Reg. § 1.1502–32, which would have excepted a carryover basis for the stock of an affiliate from reduction of basis for a dividend from preaffiliation earnings and profits, and, although the proposed amendments were not adopted, the Secretary is now estopped from applying the existing regulations to plaintiff without the aborted amendments, even if they are otherwise valid.

The existing investment adjustment regulations were published in final form in December 1966 and remained in effect and unchanged throughout the years in issue. The 1968 and 1971 distributions by Petroleum, therefore, were made at a time when the regulations, to which plaintiff voluntarily consented, required the adjustments to basis be made at the end of each consolidated return year. Thus, contrary to plaintiff's characterization of the case, the issue herein does not involve retroactive application of a regulation. Rather, the question presented is whether the Secretary should be estopped to apply a regulation in precisely the manner in which it appeared at all relevant times.

█ The heart of plaintiff's argument is that it was justified in relying on its belief that the proposed amendments would be adopted in final form and that there would be no basis adjustment as a result of the distributions by Petroleum. However, reliance on the possible adoption of proposed amendments is not the reasonably justifiable conduct that is necessary to create an estoppel. As the term itself makes clear, proposed amendments are merely preliminary proposals. They are published in the *Federal Register* pursuant to the Administrative Procedure Act, 5 U.S.C. § 553, in order to give notice to the public of a pro-

posed regulation that is under consideration. But there is nothing that requires the government to adopt in final form a regulation published as a proposed amendment, particularly when, as here, a valid regulation that deals with the subject already is in effect. Indeed, plaintiff was given actual notice by the preamble in the *Federal Register* that the proposed amendments were only tentative. The 1968 proposal appeared under the following preamble:

> Notice is hereby given that the regulations set forth in *tentative* form below are *proposed* to be prescribed by the Commissioner of Internal Revenue * * *. (Emphasis supplied.)

33 Fed.Reg. 5878 (1968). The 1971 proposal was published under a nearly identical preamble. *See* 36 Fed.Reg. 16661 (1971). Furthermore, the Treasury Department did nothing to encourage plaintiff's belief, since the only other Treasury pronouncement regarding the proposed amendments was a technical explanation of the 1971 proposal.

Plaintiff's underlying assumption is that once a proposed amendment is published it is binding on the government and may only be modified or deleted so as to *favor* taxpayers. But it is difficult to comprehend why this should be so. The notice of the proposal is made not only to those adversely affected thereby but to all interested persons—e.g., public interest groups, tax law commentators and academicians, members and staffs of Congressional committees having oversight responsibilities, and other Treasury and Internal Revenue Service personnel. Furthermore, nothing in the notice prevents the promulgators from reconsidering it in the light of pertinent statutes and its adverse effects upon the revenue. *See Georgia-Pacific Corp. v. Commissioner, supra,* 63 T.C. at 802–03.

Plaintiff also argues that its reliance upon the adoption of the proposals was warranted and the government should be estopped because 5 years elapsed between the original 1968 proposal and its deletion in 1973. But the dividends at issue were distributed in 1968 and 1970–71, far less than 5 years from the publication of the proposal.

Moreover, the elapsed time between the proposal and the deletion should have just as logically given rise to precisely the opposite inference—that the Treasury had reason to doubt the wisdom or validity of the proposals and was reconsidering them.

It is stipulated that in structuring its transactions plaintiff was advised by experienced tax counsel familiar with the applicable tax statutes and regulations. In multimillion dollar intercorporate transactions, where there is even the slightest doubt as to the tax consequences, it is customary for experienced tax counsel to request an advance private ruling from the I.R.S., which, if favorable, may ordinarily be relied upon by a taxpayer. *Bornstein v. United States,* 170 Ct.Cl. 576, 345 F.2d 558 (1965). In the absence of other evidence, it may be fairly inferred that plaintiff's decision not to make such a request and to rely on the proposed regulation instead was prompted by the desire not to "rock the boat." In short, plaintiff's conduct in relying on proposed amendments in structuring its transactions falls far short of conduct that merits an estoppel against the government.

*Wendland v. Commissioner,* 79 T.C. No. 22 (August 23, 1982), relied on by plaintiff, is inapposite. In that case, the taxpayers acquired an ongoing coal mine and at the time of purchase had actual knowledge that the Secretary previously had proposed a regulation which, if adopted, would deny a deduction available to the taxpayers under the then-existing regulation. The taxpayers also knew that the effective date of the proposed regulation was to be retroactive and would predate the purchase of the mine. Nonetheless, the taxpayers purchased the mine and planned on the deduction. After the acquisition, the proposed regulation was adopted in final form with the retroactive effective date, and the Secretary applied it to the taxpayers to deny their deduction. The Tax Court upheld the Secretary's action. In so doing, the court concluded that taxpayers that have been put on notice that the Secretary *might* promulgate a new regulation could not ignore that possibility when planning their transactions and act in reliance on the old

regulation. Application of the *Wendland* decision to the instant case, therefore, would require plaintiff, when it structured the dividend distributions from Petroleum, to have taken into account that the Secretary *might* amend Treas.Reg. § 1.1502–32. But the *Wendland* case has no bearing whatever on the rule that plaintiff seeks to apply in this case, namely, that once the Secretary publishes preliminary views in a proposed amendment he is estopped from withdrawing the proposal.

*Gottesman & Co. v. Commissioner,* 77 T.C. 1149 (1981), another case relied upon by plaintiff, also is inapposite. In that case, the issue was whether the consolidated group was subject to the accumulated earnings tax, and resolution of the issue depended on the manner of computing the group's accumulated taxable income. The regulations on the subject were ambiguous. On one occasion the Secretary proposed new regulations requiring consolidated calculations. He then withdrew this, and proposed different new regulations requiring separate calculations. In turn he withdrew these and never adopted any regulation on the subject. At trial the Commissioner contended that the taxpayer was required by the preexisting regulations to use consolidated calculations. The court first ruled that the preexisting regulations did not resolve the problem at all. It then ruled that in view of the Secretary's inability to make up his mind, there was an unfilled gap in the regulations. Therefore, the Commissioner's ad hoc interpretation of the old regulation was no more reasonable than the taxpayer's and an insufficient basis for the imposition of an accumulated earnings tax (a penalty tax on excessive accumulations). Here, however, there is no gap to be filled: Treas.Reg. § 1.1502–32(b)(2)(iii)(b) was valid and in effect at the time each distribution was made and plaintiff knew precisely what adjustments to basis it required.

Finally, plaintiff contends that the regulation, which is intended to prevent tax avoidance, should not be applied here be-

cause they could have liquidated Petroleum, distributed its assets, and avoided entirely taking the excess loss account into income. Plaintiff states that there can be no tax avoidance here since the government concedes that there was an alternative which would have achieved the desired tax result. But as the Supreme Court stated in another context—

> [t]his Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not.

*Commissioner v. Nat. Alfalfa Dehydrating,* 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974). *See also Blitzer v. United States,* 231 Ct.Cl. ——, ——, 684 F.2d 874, 887 (1982), *quoting Heyman v. Commissioner,* 70 T.C. 482, 487 (1978), *aff'd,* 652 F.2d 598 (6th Cir.1980) ("We must decide this case, however, on its facts * * * regardless of any assertions as to how things might have been done otherwise").

█ Based on the foregoing, judgment on the consolidated return issue must be entered in favor of defendant.

## II

### *The Income Received By The Individual Plaintiffs From The Annuity Contracts With The Corporations*

On June 1, 1969, each of the individual plaintiffs (annuitants) transferred property to one or the other of the corporate plaintiffs in exchange for the corporation's unsecured promise to pay to the transferor an annual sum for the life of the annuitant.

The property transferred by each of the annuitants was appraised contemporaneously by independent appraisers. The amount of the annual payment to each annuitant was determined by dividing the appraised value of the property by the appropriate factor set out in a table in Treas.Reg. § 20.2031–(7)(f). This section of the regulations sets forth the present worth of an annuity of one dollar to be paid for the remainder of an individual's life based on a standard statistical mortality table and an assumed rate of interest. The present worth table assumes that each member of the group from which the statistics were derived will have the same mortality experience and that the fund will earn at least the assumed interest rate. The agreed interest rate used to compute the annuities at issue was 3.5 percent.

The property transfers and annuity contracts may be summarized as follows:

| Annuitant-Transferor of Property | Transferee Corporation | Basis of Property to Transferor | Fair Market Value of Property Transferred | Annuity |
|---|---|---|---|---|
| Willard W. Garvey | Garvey Industries | $ 2,107,154 | $ 7,628,231 | $ 502,416 |
| Jean K. Garvey | Garvey Industries | 60,979 | 222,062 | 14,020 |
| James S. Garvey | JaGee Corp. | 2,881,976 | 8,457,252 | 523,358 |
| Shirley F. Garvey | JaGee Corp. | 32,304 | 167,550 | 10,170 |
| H. Bernerd Fink | Mid-West Industries | 302,566 | 1,050,770 | 92,686 |
| Ruth G. Fink | Mid-West Industries | 1,695,143 | 6,717,185 | 474,116 |
| George A. Lincoln | Lincoln Industries | 64,853 | 336,369 | 21,237 |
| Olivia G. Lincoln | Lincoln Industries | 1,682,436 | 6,848,261 | 400,685 |

Since the enactment of the Internal Revenue Code of 1954, the tax law has required each annuity payment to be treated as both the receipt of income and the return of an aliquot portion of the premium paid for it. The entire annuity payment is included in gross income and then the proportion of each annuity payment which the annuitant's investment in the annuity contract bears to his total expected return therefrom is excluded from income. The pertinent Code provisions are found in I.R.C. § 72, which in relevant part provides as follows:

> Annuities; Certain proceeds of endowment and life insurance contracts

> (a) General rule for annuities.—Except as otherwise provided in this chapter,

gross income includes any amount received as an annuity * * * under an annuity * * * contract.

(b) Exclusion ratio.—Gross income does not include that part of any amount received as an annuity under an annuity * * * contract which bears the same ratio to such amount as the investment in the contract (as of the annuity starting date) bears to the expected return under the contract (as of such date). * * *

(c) Definitions.—

(1) Investment in the contract—For purposes of subsection (b), the investment in the contract as of the annuity starting date is—

(A) the aggregate amount of premiums or other consideration paid for the contract * * *

\* \* \* \* \* \*

(3) Expected return.—For purposes of subsection (b), the expected return under the contract shall be determined as follows:

(A) Life expectancy.—If the expected return under the contract, for the period on and after the annuity starting date, depends in whole or in part on the life expectancy of one or more individuals, the expected return shall be computed with reference to actuarial tables prescribed by the Secretary or his delegate.

The issue herein is: When the investment in the annuity is not in the form of cash but of property valued in excess of what the transferor-annuitant originally paid for it, how is that gain to be reflected in his income?

Defendant has ruled and maintains herein that such gain is likewise realized as an aliquot portion of each annuity payment received: i.e., until the gain is fully reported each annuity consists of three parts—return of basis, capital gain and ordinary income. Rev.Rul. 69–74, 1969–1 C.B. 43 and Treas.Reg. § 1.1011–2(c) (Example 8).

Where the consideration paid for the annuity contract is a cash premium or property, the basis of which is the same as its value, the computation required by I.R.C. § 72(b) for calculating the annual exclusion from income is—

$$\frac{\text{Consideration for the contract}}{\text{Total expected return}} \times \text{Annuity}$$

This is subtracted from the annuity payment to arrive at the portion remaining in income.

However, where the consideration for the annuity contract is property having a value in excess of the transferor's basis, in Rev. Rul. 69–74 the government takes the position that the proper method of calculating the exclusion per annuity requires the substitution of the lower "transferor's basis" for the higher "fair market value" as the consideration for the contract. This results in a larger allocation to income in each annuity. If the property exchanged for the annuity is a capital asset, the ruling arrives at the capital gain component of such annual income by subtracting the basis of the transferred property from the present value of the total expected return (as of the annuity starting date) [14] and dividing the difference by the remaining years of the annuitant's life expectancy. The ruling subtracts this annual gain from the annuity income. In Treas.Reg. § 1.1011–2(c) (Example 8), which relates to annuity contracts obtained from charitable organizations in exchange for property, the same result is reached without reducing the numerator of the exclusion fraction from market value of the investment to basis, merely by subtracting the prorated annual capital gain (calculated as in Rev.Rul. 69–74) from the annual exclusion rather than from the annual income.[15]

Initially the individual plaintiffs reported the annuity receipts on their tax returns pursuant to Rev.Rul. 69–74. Subsequently they filed timely claims for refund assert-

---

**14.** The present value of the total expected annuities is determined from the annuity tables in the Treasury regulations at the rate of interest used in the annuity contract.

**15.** Neither the ruling nor the regulation spells out the Service's position with respect to property having a basis to the transferor in excess of its value at the time of transfer.

ing that each was entitled to treat the exchange of property for annuities as an "open transaction" in which no gain was realized until the transferor fully recovered the basis of his property. This was based on the conceptions that whether or not a lifetime annuitant would actually have any gain could not be determined at the time of the initial annuity receipts because of the uncertainty as to how long he would live to be entitled to them; and that since none of the obligations was issued by a life insurance company with statutory reserves and none was otherwise secured, the obligor's ability to pay was also too uncertain to give rise to the realization of gain in any annuity receipt prior to recovery of total basis.

Plaintiffs' argument for treating the exchanges of property for life annuities as open transactions is said to be based on the theory underlying *Burnet v. Logan*, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931). There the taxpayer, Mrs. Logan, had owned, since prior to March 1, 1913, 250 shares of stock in a company owning rights to iron ore. In 1916 she sold such shares to a steel company for a lump sum plus the right to receive 60 cents per ton of iron ore mined over a long term lease without any requirement for production by the company of minimum or maximum tonnage. The Commissioner of Internal Revenue ruled that the obligation of the steel company to pay the taxpayer 60 cents per ton had a fair market value in March 1916; that this sale of stock should be regarded as a closed transaction; and that such 1916 fair market value should be regarded as the basis for future payments derived from the agreement. The Supreme Court disagreed. It decided that because the consideration for the sale of Mrs. Logan's 250 shares included the promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty, it had no ascertainable fair market value and the transaction was not a closed one in 1916. Therefore, she had no income from the sale of such

shares until the payment she received exceeded their basis (March 1, 1913 value).

The foregoing represents plaintiffs' view of *Burnet v. Logan, supra*. But because plaintiffs in their brief deal with only half the decision it appears that they fail to comprehend its limitations. Mrs. Logan's mother had also owned, since March 1, 1913, 1,100 shares of similar stock, and in 1916 she too sold her stock to the steel company for an identical kind of compensation. Prior to the taxable years at issue, 1917–20, Mrs. Logan's mother died and by will left her right to receive the 60 cents per ton of ore to Mrs. Logan, which the estate valued at $277,164. Thereafter Mrs. Logan likewise received payments on account of the contract rights she had received from her mother's estate. The Court treated those payments as having a $277,164 basis because "some kind of valuation [of such contract right]—speculative or otherwise—was necessary" for estate tax purposes. 283 U.S. at 413–14, 51 S.Ct. at 552–53. The key to the difference in treatment of the two contract rights may be found in the Court's comments with respect to the first that:

> We are not dealing with royalties or deductions from gross income because of depletion of mining property. Nor does the situation demand that an effort be made to place according to the best available data some approximate value upon the contract for future payments * * * [as] probably was necessary in order to assess the mother's estate.

*Id.* at 412, 51 S.Ct. at 552.

It is questionable whether the first part of *Burnet v. Logan* has any bearing on the treatment of gain derived from exchanging appreciated property for an annuity contract. The years at issue in *Burnet v. Logan* were well before the tax law prescribed disparate treatment for capital gains and for ordinary income.[16] The tax law now generally requires an effort wherever possible to separate the gain on the exchange of

---

**16.** The first special treatment for capital gains appeared in Section 206(b) of the Revenue Act of 1921, ch. 136, 42 Stat. (part 1) 227, 233.

property for a contract and the ordinary income derived from the latter. Nothing in § 72 provides that such separation should not be made in taxing annuities. Indeed, the section so provides in excluding from ordinary income the aliquot portion attributable to the consideration paid for it. Thus the Code supplies what the Court found to be lacking in the first part of *Burnet v. Logan,* i.e., a "situation demand[ing] that an effort be made to place according to the best available data some approximate value upon the contract for future payments." 283 U.S. at 412, 51 S.Ct. at 552.

In *McCormac v. United States,* 191 Ct.Cl. 483, 424 F.2d 607 (1970), the Court of Claims rejected the same kind of overly broad application of the "open transaction" rationale of *Burnet v. Logan* which the plaintiffs urge here. There the taxpayers had transferred stock of a cemetery corporation to a non-profit corporation in exchange, for an agreement to pay to the transferors 40 percent of the transferee's gross sales (an uncertain amount) for the life of the cemetery (an indefinite period). The taxpayers contended that because of the uncertainty as to how much they would receive the contract could not be fairly valued and the transfer of stock was for the indefinitely continuing payments, which should be treated as return of their investment and, if exceeded, capital gain. However, recognizing the need imposed by law to separate the capital gain on the exchange from the ordinary income derived from the contract, the court approved the position of the Internal Revenue Service in Rev.Rul. 58–402, 1958–2 C.B. 15 that "[c]ontracts and claims to receive indefinite amounts, such as those received in exchange for stock * * * must be valued for Federal income tax purposes *except in rare and extraordinary cases.*" 191 Ct.Cl. at 499, 424 F.2d at 619. (Emphasis the court's.) *See also Campbell v. United States,* 228 Ct.Cl. ——, ——, 661 F.2d 209, 215 (1981); *Estate*

*of Bird v. United States,* 534 F.2d 1214, 1218 (6th Cir.1976).

Moreover, if the exchange of appreciated assets for a contract is otherwise a taxable event, the argument that no gain is realized (I.R.C. § 1001(a), (b)) because the property received has no readily ascertainable value, has been severely limited by the rule in *United States v. Davis,* 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962). Section 1001(a) of the Code provides that the gain from the disposition of property shall be the excess of "the amount realized" therefrom over the adjusted basis for determining gain; and § 1001(b) provides that "the amount realized" shall be the sum of any money received plus "the fair market value of the property (other than money) received." In *Davis,* the taxpayer, in a divorce settlement, had transferred to his wife various appreciated properties. The "property received" being the release of the wife's inchoate marital rights, the Court of Claims found that there was no way to compute the fair market value of such marital rights and it was thus impossible to determine the taxable gain realized by the taxpayer. The Supreme Court held this conclusion was erroneous because "[A]bsent a readily ascertainable value it is accepted practice where property is exchanged to hold that the values 'of the two properties exchanged in an arms length transaction are either equal in fact, or are presumed to be equal' [citation omitted]." *See also Matthews v. United States,* 191 Ct.Cl. 674, 425 F.2d 738 (1970).

Even if *Burnet v. Logan* continues to provide a viable construction of § 1001 of the Code in some contexts, it should not have any force with respect to the application of § 72. That section provides that a proportionate part of every annuity is includable in income without regard to whether or not the annuitant has or ever will recoup his entire investment [17]; and the

17. S.Rep. No. 1622, 83d Cong., 2d Sess. 171, *reprinted in* 1954 U.S.Code Cong. & Ad.News 4621, 4806, states:

(3) In the case of amounts received as an annuity (other than certain employee annuities), the proportionate part of each payment which is to be considered a return of invest-

section is not limited to annuities issued by insurance companies with statutory reserves or to those payable out of designated funds or secured by trusts or mortgages, so that there need be no assurance that the obligor will be able to pay back the annuitant's premium or investment before the remainder becomes taxable. Furthermore, the section requires the determination in every case of the cash or fair market value of the consideration paid for it, which under the rule of *United States v. Davis* provides a satisfactory measure of its *quid pro quo,* the commuted value of the annuity payments. Thus, it is evident that Congress can hardly have intended that the operation of § 72 be restricted by the theory of *Burnet v. Logan.*

Since § 72 of the Code prescribes the method of taxation of annuity income, resolution of the question of the proper treatment of the capital gain involved in an exchange of appreciated property for a private annuity contract more properly calls for an examination of the purposes of that statute rather than for speculation as to the proper application of a 50-year old Supreme Court decision interpreting earlier statutes and derived from a wholly different set of circumstances.

Both the House and Senate committee reports on the Internal Revenue Code of 1954 explained that the purpose of § 72(a) through (c) was to revise the method of taxing annuity income under the 1939 Code because it was unsatisfactory. Section 22(b) of the 1939 Code taxed an annuitant on the annuity payments he received to the extent of 3 percent of the amount he paid for the annuity. Any payments he received above that amount were considered to be the return of his capital and were excluded from tax until the cumulative amount ex-cluded equalled the amount he paid for the annuity. Thereafter, the annuity payments he received were taxable in full. The Senate Committee on Finance explained the purpose and operation of the new legislation as follows:

This present [1939] rule is objectionable because it is erratic. Where the amount paid for the annuity represents a large proportion of its value at the time payments begin, the present rule does not return to the annuitant on a tax-free basis the amount he paid for the annuity during his lifetime. On the other hand, where the amount the annuitant paid for the annuity represents a small proportion of its value at the time payments begin, the exclusion is used up rapidly. In such cases the annuitant finds that after being retired for a few years and becoming accustomed to living on a certain amount of income after tax, he suddenly has to make a sizable downward adjustment in his living standard because, when his exclusion is used up, the annuity income becomes fully taxable.

The House bill and your committee have adopted a provision which spreads the tax-free portion of the annuity income evenly over the annuitant's lifetime. In the usual case the exclusion will equal the amount the annuitant paid for the annuity, divided by his life expectancy at the time the payments begin. This exclusion is to remain the same even though he outlives this life expectancy. Under this rule the company providing the annuity will be able to supply the annuitant with a statement indicating that for the rest of his life a stated amount of his annuity income will be excluded annually from his income subject to tax.[18]

S.Rep. No. 1622, 83d Cong., 2d Sess. 11, *reprinted in* 1954 U.S.Code Cong. & Ad. News 4621, 4640–41.

---

ment (and thus excludable from gross income) is to be determined by the ratio which the investment in the contract bears to the expected return under the contract. The investment in the contract will be determinable from actuarial tables to be provided by the Secretary or his delegate. *Once determined for a particular contract the excludable portion of the payment remains fixed despite the* fact that the individual may die before or after his life expectancy. * * * [Underscoring supplied.]

H.R.Rep. No. 1337, 83d Cong., 2d Sess. A21, *reprinted in* 1954 U.S.Code Cong. & Ad.News 4017, 4157, is substantially identical.

**18.** H.R.Rep. No. 1337, *supra,* at 11, contains substantially identical language.

Nothing in the committee reports suggests any purpose to exclude from income the capital gain that would otherwise be payable on an arms length exchange of property for annuities at fair market value where such value is in excess of the transferor's basis for the property. Indeed the committee reports are incompatible with the notion that any sum in excess of basis is to be excluded from income each year the annuity is received. The Senate report states that subsection (b) of § 72 establishes an exclusion ratio "which is designed to exclude from gross income the proportionate part of each amount received as an annuity which is considered to represent a return of capital." S.Rep. No. 1622, *supra,* at 172, 1954 U.S.Code Cong. & Ad.News 4807.[19] If the exclusion ratio is designed to exclude from income only the part of the annuity which represents "a return of capital," it is necessarily limited to a return of the annuitant's basis for the property exchanged. To allow a taxpayer to exclude from income the portion of an annuity he purchased with untaxed gain would give him far more than a return of capital. *Cf. Detroit Edison Co. v. Commissioner,* 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286 (1943).

■ As previously stated, plaintiffs do not dispute that capital gain may be derived from the exchange of appreciated property for an annuity contract but claim that it is not realized until after the transferor has had the amount of his entire basis for the property returned to him free of tax. But plaintiffs' proposal is not consistent with the intent of the current statutory scheme for taxing annuities. If the income on the exchange of property for an annuity contract is to be taxed on the receipt of each annuity, there is no basis in Congressional intent for postponing the tax on a part of such annual receipt. Moreover plaintiffs' proposal would restore the 1939 Code situation where the annuitant would be unable to spread his tax payments evenly over his remaining lifespan and would cause him to incur large tax liability in his later years after the basis of his property has been returned. It is more in keeping with the statutory scheme and, therefore, more reasonable to impute to Congress the intent that the capital gain as well as the ordinary income component of the annuity payments should be prorated over the term of the annuity.[20]

In *212 Corporation v. Commissioner,* 70 T.C. 788 (1978) and *Estate of Bell v. Commissioner,* 60 T.C. 469 (1973), the Tax Court ruled that the capital gain on appreciated property exchanged for a secured private lifetime annuity contract was realized when the parties entered into the contract, the measure being the difference between the basis for the transferred property and the value of the annuity contract. Although in both cases the same uncertainties existed as to whether and when the annuitant would recoup his basis, the court was of the opinion that, the obligation under the annuity contract being secured, it was property the receipt of which was in itself a taxable event. In each case six judges dissented, being of the view that § 72 requires the proration of the capital gain as well as ordinary income. However, the Tax Court's decisions in these cases are not significant precedents with respect to the issue

---

**19.** H.R.Rep. No. 1337, *supra,* at A22, is substantially identical.

**20.** *See* Learned Hand, "How Far is a Judge Free in Rendering a Decision?" (Radio Broadcast, May 4, 1933) *reprinted in The Spirit of Liberty—Papers and Addresses of Learned Hand* (I. Dilliard ed. 1960), p. 106:

* * * How does [the judge] in fact proceed? Although at times he says and believes that he is not doing so, what he really does is to take the language before him, whether it be from a statute or from the decision of a former judge, and try to find out what the government, or his predecessor, would have done, if the case before him had been before them. He calls this finding the intent of the statute or of the doctrine. This is often not really true. The men who used the language did not have any intent at all about the case that has come up; it had not occurred to their minds. Strictly speaking, it is impossible to know what they would have said about it, if it had. All they have done is to write down certain words which they mean to apply generally to situations of that kind. * * *

herein, since neither side urges that the receipts of the unsecured annuity contracts in these cases were the taxable events giving rise to capital gain.

There remains for consideration plaintiffs' argument that, if § 72 requires the pro rata reporting in each year of gain on the property exchanged for the annuities irrespective of whether or not the annuitant ever recovers his basis in the property, it is unconstitutional because it taxes gross receipts rather than income. Although plaintiffs do not go so far, it may be noted that the same argument may be made against the validity of the entire annuity taxing scheme—since even an annuitant who acquired his contract for a cash premium may never recover his investment in the contract if he dies before his life expectancy termination date.

However, it is unnecessary to reach the unconstitutionality argument in this case. The record does not reflect that any of the annuitant plaintiffs died prior to the end of his life expectancy and that his estate was denied recovery of his basis in the annuity contract. Both Rev.Rul. 69–74 and Treas. Reg. § 1.1011–2(c) (Example 8) provide that where the transferor-annuitant outlives his life expectancy and therefore has reported in capital gains the entire appreciation on the transferred property the income component of his annuities thereafter is wholly ordinary income; but neither the ruling nor the regulation states the Internal Revenue Service's position with respect to the overpayment by a short-lived annuitant of capital gain tax on appreciated property exchanged for an annuity contract. The proper treatment of such an overpayment was not briefed by either party, and defendant's attorney stated at oral argument that he could not set forth the I.R.S.' position on it. Although § 72 does not permit a readjustment of the ordinary income component of the annuities of either the short- or long-lived annuitant, it does not deal specifically with the capital gain compo-

nent. It may be that the estate of a short-lived annuitant would be entitled to a capital loss deduction. *Cf. Arrowsmith v. Commissioner,* 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6 (1952). Or it may be that the estate would be entitled to tax refunds for prior years with the aid of the Mitigation of Effect of Limitations Statutes, I.R.C. §§ 1311–1314. In any event, constitutional issues should not be decided on hypothetical facts and in the absence of full briefing by both sides.

Accordingly, judgment must be granted in favor of defendant on this issue.

### III

*The Interest Deductions Claimed by the Corporate Plaintiffs*

The annuity contracts exchanged for the properties of the individual plaintiffs contained no provisions for interest. However, as previously noted, the amount of consideration transferred was computed from standard tables which set forth the average present worth of an annuity of one dollar to be paid for the remainder of the life of an ·individual based on a standard statistical mortality table and the assumption that the fund would be able to earn 3.5 percent interest during the interim period. Stemming from this the corporate plaintiffs claim that implicitly included in each annuity payment during the taxable years was a 3.5 percent interest payment and they were entitled to deduct it on their income tax returns pursuant to I.R.C. § 163.[21]

Two barriers stand in the way of the allowance of such a deduction. First, "an expenditure incurred in acquiring capital assets must be capitalized even when the expenditure otherwise might be deemed deductible under [I.R.C.] Part VI [in which § 163 is included]." *Commissioner v. Idaho Power Co.,* 418 U.S. 1, 17, 94 S.Ct. 2757, 2767, 41 L.Ed.2d 535 (1974). Second, the deduction allowed by § 163 is for interest paid or accrued within the taxable year "on indebtedness." No interest deduction is al-

---

21. I.R.C. § 163 provides in pertinent part as follows:

    Interest

    (a) General rule.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

lowable on obligations which are not payable unconditionally but depend upon the occurrence of particular events. *Cuyuna Realty Co. v. United States,* 180 Ct.Cl. 879, 883, 382 F.2d 298, 300 (1967); *Guardian Investment Corp. v. Phinney,* 253 F.2d 326, 331 (5th Cir.1958); *United States v. Virgin, Jr.,* 230 F.2d 880 (5th Cir.1956); *Autenreith v. Commissioner,* 115 F.2d 856, 858 (3d Cir. 1940).

█ Practically all courts which have considered the issue are now in agreement that no part of an annuity payment made pursuant to a private annuity contract for the purchase of property is deductible as interest under § 163. The entire amount of each annuity payment constitutes part of the purchase price of the property, a capital expenditure, and, therefore, no part thereof is deductible as interest. The mere fact that the annuities are paid over a period of time so that the parties must have taken into account the delay in payment as a factor in fixing the amount does not mean that the purchase price is a lesser sum plus interest. Furthermore, when each annuity is contingent upon the continued existence of a measuring life or lives, the obligation is not payable in any event and hence is not an indebtedness for which interest may be deductible pursuant to § 163. *Bell v. Commissioner,* 76 T.C. 232, 237–39 (1981), *aff'd per curiam,* 668 F.2d 448 (8th Cir.1982); *Dix v. Commissioner,* 392 F.2d 313, 317–18 (4th Cir.1968); *F.A. Gillespie & Sons Co. v. Commissioner,* 154 F.2d 913, 917–18 (10th Cir.), *cert. denied,* 329 U.S. 781, 67 S.Ct. 204, 91 L.Ed. 670 (1946); *Autenreith v. Commissioner, supra,* 115 F.2d at 858; *Klein v. Commissioner,* 31 B.T.A. 910, 917–19 (1934), *aff'd,* 84 F.2d 310 (7th Cir.1936); *Corbett Investment Co. v. Helvering,* 75 F.2d 525 (D.C.Cir.1935); *Reliable Incubator & Brooder Co. v. Commissioner,* 6 T.C. 919, 926 (1946).

Plaintiffs cite only a single case to the contrary: *John C. Moore Corp. v. Commissioner,* 15 B.T.A. 1140 (1929), *aff'd,* 42 F.2d 186 (2d Cir.1930). In that case, on December 26, 1912, the corporate taxpayer had entered into an agreement with the owner of the premises it leased to pay her $10,000 per year for life in return for her conveyance of the buildings to it. The question at issue was whether or not the corporation was entitled to deduct the annual payments for the taxable years 1922 and 1923. The Board of Tax Appeals found that as of the contract date the value of the buildings and the discounted value of the annuity contracts were both $80,000. It ruled that the transaction was an exchange of the buildings for the annuity contract and not for the annuities themselves; therefore, each $10,000 annual payment consisted in part of satisfaction of the contract liability for the principal and in part of interest, and the amount deductible as interest for each year was the difference between the $10,000 and its discounted value (at a 6 percent annual rate) as of December 26, 1912. Seven Board members dissented for the reason that "no part of the amounts paid by the corporation to the seller of the building can be deducted, because all payments are the purchase price or cost of the building and such an investment of capital is not deductible." 15 B.T.A. at 1145. The Court of Appeals affirmed, holding that even if the exchange was property for annuities (rather than for the contract), the Board's setting aside of the Commissioner's proposed disallowance of deduction of part of each annuity was still correct, because the parties intended the exchange to be an $80,000 building for $80,000 in annuities and any excess payments in 1922 and 1923 were either losses (because $80,000 had already been paid out) or interest payments. It did not find it necessary to decide which theory was correct.

However, the Board of Tax Appeals and Tax Court in decisions since *Moore Corp.* have repudiated the Board's theory in that case and have followed the rule asserted by the dissent, *see e.g., Klein v. Commissioner, supra; Citizens National Bank of Kirksville v. Commissioner,* 42 B.T.A. 539, 544–45 (1940), *aff'd,* 122 F.2d 1011 (8th Cir.1941), *cert. denied,* 315 U.S. 822, 62 S.Ct. 913, 86 L.Ed. 1219 (1942); *Reliable Incubator & Brooder Co. v. Commissioner, supra; Kaufman's Inc. v. Commissioner,* 28 T.C. 1179,

1184–85 (1957); *Dix v. Commissioner,* 46 T.C. 796, 804 (1966), *aff'd,* 392 F.2d 313, 317–18 (4th Cir.1968); *Bell v. Commissioner, supra;* and, while the Court of Appeals for the Second Circuit has not had occasion to rule on the issue again, as the cases *supra* indicate, its *Moore Corp.* decision is contrary to the decisions of at least six other circuits and the Tax Court.

Plaintiffs urge, as did the court in *Moore Corp.,* that if the law taxes annuity income to the recipient, the rule should be reciprocal and the payor should be allowed a deduction to the same extent. But this is only a superficial equity, which the Code does not require in other contexts. For example, a builder who is paid for the construction of a plant receives ordinary income while the payor has made a non-deductible capital expenditure. A bank charging interest on a construction loan receives ordinary income but the payor may treat the payment as a capital expenditure.[22]

Far from adopting plaintiffs' theory that in a contract to acquire property in exchange for annuities there is implicit an agreement that only a portion of each annuity is principal and the remainder is interest, there is evidence that Congress has been aware of the contrary decisions of the courts and has either approved or at least has not disapproved them.

At the time of the adoption of the Internal Revenue Code of 1954, when Congress approved the revised treatment of annuities in § 72, it also had under consideration a proposed § 1241 which provided rules for handling the tax consequences of an exchange of property in return for a series of payments contingent upon the life expectancy of the seller of the property. The proposed section specified that the taxpayer who sells or exchanges property under such an arrangement must include in the amount realized on the sale or exchange the value of the annuity contract; and it also provided that the portion of each annuity pay-

ment made by the purchaser of the property which is equal to the portion includable in the gross income of the annuitant pursuant to the application of § 72 should be deducted from the gross income of the purchaser as interest. The House Committee explained that "This is \* \* \* a departure from the court decisions, e.g., *Gillespie and Sons v. Comm.* (154 Fed. 913, cert. den. 39 U.S. 781)." [23] H.R.Rep. No. 1337, *supra* at A287. Since Congress did not enact the proposed § 1241 (because it wanted an opportunity for further study of the operation of § 72),[24] its understanding that in the absence of such measure existing law does not allow deductions for imputed interest is evidence of its continuing intent in this regard.

More important, in 1964 Congress enacted § 483 of the Internal Revenue Code. This section provides that generally, on a sale or exchange of property pursuant to which some of the payments are deferred for more than a year, portions of the deferred payments are to be treated as interest both to seller and buyer. But it also provided as a specific exception in subsection (f):

> (5) Annuities.—This section shall not apply to any amount the liability for which depends in whole or in part on the life expectancy of one or more individuals and which constitutes an amount received as an annuity to which section 72 applies.

Plaintiffs argue that when § 483(f)(5) refers to "an amount received as an annuity to which section 72 applies," it means only that portion which § 72(b) excludes from income treatment and therefore imputed interest treatment is still proper for the portion included in the annuitant's gross income. Nothing in the statutory language warrants plaintiffs' reading. Although § 72(b) allocates the annuity between principal and income, the section necessary applies to the entire annuity. The committee reports are also incompatible with plain-

---

**22.** I.R.C. § 266.

**23.** The citation to *Gillespie and Sons* contains several typographical errors. For the correct citation see p. 127, *supra.*

**24.** S.Rep. No. 1622, *supra,* at 116; H.Conf.Rep. No. 2543, 83d Cong., 2d Sess. 71, *reprinted in* 1954 U.S.Cong. & Ad.News 5280, 5332.

tiffs' overly restrictive interpretation. The House Committee report on § 483, H.R.Rep. No. 749, 88th Cong., 2d Sess. 74, *reprinted in* 1964 U.S.Code Cong. & Ad.News 1313, 1382 states: [25]

> [T]he provision is not to apply where the property is exchanged for annuity payments which depend in whole or in part on the life expectancy of one or more individuals.

It is evident that Congress has been aware that the case law denies interest deductions for a taxpayer who makes deferred payments in the form of lifetime annuities in exchanges for property. It has also given consideration to the allowance of such deductions but has declined to do so. Under the circumstances even if I disagreed with the overwhelming weight of authority (which I do not), I must infer that Congress has reserved to itself the making of any changes therein. Plaintiffs' arguments should therefore more properly be addressed to the legislature than to this court. *Cf. American Automobile Association v. United States,* 367 U.S. 687, 694–97, 81 S.Ct. 1727, 1730–32, 6 L.Ed.2d 1109 (1961).

Judgment must likewise be granted in favor of defendant on this issue.

## CONCLUSION

For the foregoing reasons judgment should be entered dismissing all petitions. The clerk is directed to allow costs to the defendant.

---

**25.** S.Rep. No. 830, 88th Cong., 2d Sess. 103, *reprinted in* 1964 U.S.Code Cong. & Ad.News 1673, 1776 contains identical language.